## DAEUFFER–LIEBERMAN BREWING CO., Inc., v. UNITED STATES.

Circuit Court of Appeals, Third Circuit.
November 18, 1929.

No. 4263.

P. J. Friel and John W. Crolly, both of Philadelphia, Pa., for appellant.

Calvin S. Boyer, Acting U. S. Atty., and Howard Benton Lewis, both of Philadelphia, Pa., for the United States.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. The government filed a bill in equity under section 22, title 2 of the National Prohibition Act (27 USCA § 34) averring that the respondent was maintaining a common nuisance, as defined by section 21 of the same title of the act (27 USCA § 33), and concluding with the usual prayers. The District Court, finding that the premises, which consisted of a brewery and outbuildings situated in the City of Allentown, State of Pennsylvania, were used, and likely would continue to be used, as a place where intoxicating liquor is manufactured, sold, kept, or bartered in violation of the law, entered the decree here appealed from, ordering that the nuisance be abated, that the respondent, its agents and employees be restrained from further maintaining a nuisance and that certain of its buildings be closed for one year. Availing ourselves of the court's statement, it appears from the testimony of the government's witnesses that on the night of March 21–22, 1929, two prohibition agents, lying concealed in a field, had the brewery under observation. At various times, beginning at about 2 o'clock in the morning, a number of automobiles arrived at the brewery. Men were seen to go from the brewery and speak to men in the automobiles, and men in the automobiles were seen to leave them and enter the brewery. At about 3:30, two men came from the direction of the brewery, and after searching with flashlights the field in which the agents were hiding returned without having come upon them. At 4 o'clock a large truck arrived and backed against the loading platform. At 4:15 the agents went to the door of the brewery and one of them pounded upon it and announced himself as a federal officer. As he did so, they were suddenly attacked by three men, two of whom had been standing in the doorway of a hotel near by, and one of whom

stepped from the running-board of an automobile parked in front of the premises. There is no evidence that the men who assaulted the agents were in any way connected with the brewery. Reference to the attack is not made with that in mind, but to show that nearly an hour elapsed between the time the agents announced their presence and the time they finally got into the brewery. After the arrival of police and, later, of two or three other agents, the agents seeking admittance were finally admitted at about 5:10 o'clock. In the brewery they found these conditions: The door of the racking room could not be opened, and it had to be broken down. In the racking room were many kegs, some of them stacked in regular order and about 200 lying scattered in every direction. The kegs were wet, the floor was covered with beer foam, and there was foam in the kegs. The truck which the agents had seen enter the yard was backed against a loading platform adjacent to the wash room door, and a skid, placed from it to the platform, was wet, apparently as a result of recent use. Another door of the racking room was barred. The racking machine showed evidence of having been recently washed out with water. The beer kegs which were standing on end were empty, but there was beer remaining in some of those which were lying on their sides. In one there were five or six gallons and in two others smaller quantities. Samples were taken and the beer proved to be of unlawful alcoholic content.

The learned trial judge said:

"I accept this testimony of the agents as true, and find the facts to be as above stated. I reject the testimony of various brewery employees, offered in explanation or contradiction, as untrue. The evidence clearly establishes to my mind that the entry of the agents came at a time when a run and shipment of illegal beer was being made, that the delay which intervened between the time the agents first knocked and the time when they finally entered the racking room, caused by the assault upon them and by the difficulty in getting into the racking room, enabled the employees of the brewery to partially but not entirely dispose of the evidence of the violation, and that during that time most of those upon the premises escaped without being seen. In this connection there was also evidence that two nights before at four o'clock in the morning the agents entered the brewery, after seeing the men search the field with search lights in the same manner as on the night in question and found a staff of twelve to fourteen employees upon the premises.

The possession of high-powered beer in containers in the racking room was a violation of the regulations and of the conditions of the permit. The barred and inaccessible condition of the racking room was a violation of the regulations."

On the main issue, whether the proofs establish a nuisance within the meaning of the Act, the evidence sustains or fails to sustain the decree according to the inferences lawfully to be drawn from it. Having read the record in the same way, we shall accept and reject that testimony which the learned trial judge, who saw the witnesses and had an opportunity to pass upon their credibility, accepted and rejected and confine our discussion to the few questions of law which emerged at the trial.

▮▮ Adverting to the definition of a common nuisance (section 21, title 2) as any building or place "where intoxicating liquor is manufactured, sold, kept, or bartered in violation of this title," the respondent, regarding the unlawful sale of intoxicating liquor as the capital element of a nuisance thus defined, maintains that there is no evidence in the case that it sold or bartered liquor of unlawful alcoholic content. This is nearly but not quite true, for from the evidence on which the court found that when the agents entered the brewery "a run and shipment of illegal beer was being made," there is a permissible inference that the shipment was being made for sale, and this inference stands until displaced by countervailing evidence. But the elements of the statutory nuisance, of which sale is but one, are named in the disjunctive, and, singly or with others, may constitute a nuisance without an actual sale or barter. The others are the manufacture or keeping of intoxicating liquor in violation of the law.

▮ The respondent admits that it manufactured and kept liquor of an alcoholic content higher than that generally allowed by law but justifies under a brewing permit, which, due to the process of making, contemplates and authorizes the manufacture and keeping of liquor of that alcoholic content, and takes the position that "since the possession, keeping and manufacturing of such beverage is permitted under the permit to the brewery, such possession, keeping and manufacturing *cannot* be unlawful nor in violation of section 21, title 2, of the National Prohibition Act." We think the expression "*cannot* be unlawful" is too strong—*may not* be unlawful is the more apposite term. A permit, by the definition given in section 1 of title 2 of act (27 USCA § 4), means "a formal written authorization by the Commissioner setting forth specifically therein the things that are authorized." It is clear that the authorization of a permit extends no further than the lawful manufacture and keeping of liquor at the high alcoholic content and its ultimate sale at the low content. That it may be manufactured with a high alcoholic content is conceded; that it may be kept until the alcoholic content is reduced to the lawful percentage is not disputed. But in order properly to observe the law it is also clear that intoxicating liquor lawfully manufactured with a high alcoholic content should not, and cannot, be kept with that content except in the orderly process of manufacture. It is the necessities of manufacture that justify the exception to the law. When it is kept beyond that, it assumes the character of a contraband commodity and falls within the inhibition of the law. To prevent that very thing, Section 1011 of Regulation No. 2, effective October 1, 1927, provides that malt liquor, such as beer, "containing one-half of one per cent. or more of alcohol by volume, may not be placed or stored in * * * portable containers on the premises where cereal beverages are made * * *" the practical operation of which is to prevent the transfer of high-powered beer at an intermediate stage of manufacture to containers used for delivering lawful near beer and thereby prevent illicit beer reaching the public. That is a regulation of a department of government addressed to and, we think, reasonably adapted to the enforcement of the Act of Congress, the administration of which is confided to that department, and has the force and effect of law when, as here, it is not in conflict with express statutory provisions. Maryland Casualty Company v. United States, 251 U. S. 342, 349, 40 S. Ct. 155, 64 L. Ed. 297.

▮ It was proved that small quantities of high-powered beer were found in kegs—portable containers—in the respondent's racking room. That was a violation of a regulation (section 1011 of Regulation 2) which is valid and therefore a violation of law. It was also proved that the door of the racking room was barred and the room made inaccessible to government agents. That, too, was a violation of a valid regulation reasonably adapted to the enforcement of the law (section 103 of Regulation 2). Both unlawful acts were evidence of the maintenance of a nuisance. The respondent contends, however, that mere possession of liquor with the forbidden alcoholic content in portable containers upon the premises is not evidence of a violation of

the law because the regulation imposes no penalty for its non-observance, and because there is no proof of the "source" of the liquor, that is, no proof that the respondent put it there. It should be kept in mind that this is not a criminal action for a violation of the prohibition law but is a civil action in equity charging a common nuisance. The commission of forbidden acts within the definition of a nuisance constitutes evidence of a nuisance. Keeping liquor in places upon the respondent's premises not authorized by the permit and expressly forbidden by regulations is evidence of a nuisance which will prevail until explained satisfactorily.

At the time of the institution of this suit in equity the respondent held a permit for the manufacture and sale of cereal beverages which, after litigation, was found to be valid. Seemingly the respondent takes the position that its permit operates to prevent and defeat this suit in equity for a common nuisance as long as the permit runs. There is nothing antagonistic in the two provisions of the prohibition law which provide a permit lawfully to conduct a business involving the manufacture of alcohol and an action to abate a nuisance in the unlawful manufacture and keeping of liquor. On the contrary, the provisions are wholly consistent. A permit is an "authorization" to do the "things * * * authorized"; it authorizes only lawful acts. No valid permit could authorize the doing of an unlawful thing. No permit ever authorized the maintenance of a nuisance. When it is found that a common nuisance is maintained on premises the law empowers the court to abate the nuisance by closing the premises. The permit, not being a bar to such an action, is thereby suspended and becomes inoperative for the time the premises are closed.

On the facts and law the decree of the District Court is affirmed.