**CROWN ZELLERBACH CORPORATION**

v.

**Raymond MARSHALL, Secretary of Labor, et al.**

**Civ. A. No. 77–1833.**

United States District Court, E. D. Louisiana.

Oct. 25, 1977.

---

Robert K. McCall, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for plaintiff.

Louis G. Ferrand, Jr., Counsel for Civil Rights, Dept. of Labor, Washington, D.C., James D. Llewellyn, Regional Counsel, General Services Administration, Fort Worth, Tex., Joan Elaine Chauvin, Asst. U.S. Atty., New Orleans, La., David L. Rose, Dept. of Justice, Washington, D.C., for defendants.

ALVIN B. RUBIN, Circuit Judge: *

This motion for a preliminary injunction raises the issue whether the government, without a hearing, may refuse to contract with firms that do not adopt a seniority system that is intended to provide affirmative action relief to females. The seniority system that the government here

---

* Sitting as District Judge by designation of Chief Judge John R. Brown.

requires would provide females with seniority rights that would be less favorable to the company's present employees, who are predominantly male, than those accorded under the terms of the company's existing collective bargaining agreement, and would, in effect, require renegotiation of that contract. But the executive may validly decide not to enter into a particular contract on the basis that specific conditions affecting the composition of a bidder's work force violate governmental policy. Hence, the motion is DENIED.

I

On August 17, 1976, the General Services Administration ("GSA"), conducted a "pre-award" compliance review of Crown Zellerbach Corporation's ("Crown's") Container Plant at its Bogalusa, Louisiana facility. In a letter dated September 8, 1976, GSA informed Crown that, in GSA's opinion, female employees and female applicants had been subject to sex-based discrimination. Thereafter, GSA informed Crown that it had confirmed the existence of sex discrimination against females, and it listed steps that it believed Crown should take in order to come into compliance with Executive Order 11246,[1] as amended.

Following attempts by GSA and the Company to resolve the dispute, Crown sought a temporary restraining order and a preliminary and permanent injunction barring the government from denying Crown future government contracts. Three hearings were held on Crown's request for a temporary restraining order. It developed that the government sought both remedial action with respect to Crown's performance of existing contracts, and in addition, assurances of the manner in which it would perform contracts that it would seek in the future. At the conclusion of the third hearing, the court granted a temporary restraining order, which restrained the government from adversely affecting Crown,

. . . based upon [Crown's] failure to provide relief for alleged violation of past government contracts without affording Crown . . . notice and hearing on any issues of alleged discrimination arising out of past conduct by Crown . . . at its Bogalusa, Louisiana Facilities.

But the court specifically refused to enjoin the government from exacting as a condition of future contracts an agreement by Crown,

. . . not to discriminate in employment on the basis of sex; [to utilize] goals and timetables for the hiring and promotion of females; [to create] a non-hostile work atmosphere for females; [and to safeguard] opportunities for promotion of female applicants and incumbents.

The court also asked the government to prepare a list of those requirements it sought to impose on Crown that it believed were subject to the temporary restraining order, as well as a separate list of those items that it believed were not subject to the order.

The government prepared such a list, including as its requirements that female employees who bid into jobs subject to goals and timetables[2] should take their company

---

1. Executive Order 11246 became effective on October 24, 1965. Like its predecessors, it prohibited discrimination on grounds of race, color, religion and national origin by federal contractors and subcontractors. In 1967, it was amended by Executive Order 11375, which added sex discrimination to the prohibited practices. Section 201 of the Executive Order provides that the Secretary of Labor shall be responsible for the administration of Part II of Executive Order 11246 which deals with "Nondiscrimination in Employment by Government Contractors and Subcontractors," and it authorizes him to "adopt such rules and regulations and issue such orders as he deems necessary and appropriate to achieve the purposes" of the Executive Order.

2. The proposal requires:
Crown Zellerbach Corporation shall adopt and seek to achieve a goal of hiring sufficient numbers of qualified black and white female individuals into jobs covered by its collective bargaining agreements with Local Nos. 189 and 1362 of the United Paper-workers International Union (hereinafter the Union) so that at least 30% of all new hires in Union represented jobs in each of its four Plants (i. e., Box or Container, Paper Mill, Grocery Bag Plant, and Multiwall Bag Plant) in each six month period are

seniority with them for use in those jobs, and that incumbent employees in the jobs would also use their company seniority when in competition against these women.[3] This would require Crown to violate its agreement with Local 189, United Paper Workers International Union, which provides that employees utilize their job seniority in bidding for promotion and their seniority in a line of progress for layoffs,[4] as well as their agreement with Local No. 1362 representing production and maintenance workers at the Box, Multiwall Bag, and Grocery Bag plants, which provides that those employees utilize a combined system of plant and line of progression seniority.[5]

Crown requested, pursuant to 41 CFR 60–2.2(b), that the Director of OFCCP determine that there are substantial issues of law and fact "concerning the eligibility, qualifications and rights, constructive seniority, and other remedies," and that the claims and proposed remedies involved various substantial factual and legal questions, in order to obtain a hearing on these issues. The Director issued such a determination in which he granted the portion of Crown's request that dealt with the identity of individual affected class members and the relief due them on an individual basis. However, the Director's determination specifically excluded appropriate goals and timetables, maternity leave standards, and other related requirements that the government seeks to impose as a condition of its future government contracts.

Thereafter, at a hearing on Crown's motion for a preliminary injunction, counsel for the government informed the court that Crown would not be denied government contracts because of its failure to provide affected class relief on an individual basis as set out in the Director of OFCCP's "substantial issues" determination. However, the government would seek to exact other requirements, with respect to seniority and other action on behalf of females, as a condition to Crown's receiving government contracts in the future. The court denied Crown's Motion for a Preliminary Injunction.

After further meetings between the parties, Crown filed a new motion seeking to prevent the government from withholding future contracts on the basis of Crown's failure to adopt the seniority system proposed by the government. Thus, in effect, Crown once again sought to compel the government to continue to award future contracts to it until there had been a hearing with respect to the manner of utilizing females under the terms of those contracts.

This motion for a preliminary injunction raises four discrete issues: Whether withholding fewer than two contracts without a prior hearing violates the requirements of the Executive Order; whether withholding the contracts without a hearing violates the due process clause of the Constitution; whether the Executive Order was promulgated pursuant to the applicable provisions of the Administrative Procedure Act, 5 U.S.C. § 551, et seq., so as to be valid and enforceable; and whether the government's proposed seniority plan violates a national policy to preserve "bona fide" seniority systems as expressed in Section 703(h) of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–2(h). We shall consider these issues separately.

female, (with a goal of at least 25% of those females being black). Crown Zellerbach shall adhere to this hiring goal until female representation in 75% of the craft jobs, 75% of the operative jobs, and 75% of the laborer jobs [excluding any operative jobs which presently have more than 40% female representation] have 25% female representation.

3. The provision requires:
Female employees in the Grocery Bag Plant, Multi-wall Plant and Box Plant, who transfer into any of the jobs which are subject to the goals in paragraph 2, supra, shall, upon obtaining any of those jobs, use their company seniority (i. e. date of hire at the Bogalusa facility) for all purposes for which seniority is a factor, including but not limited to promotion, transfer, demotion, set-ups (both temporary and permanent), filling temporary vacancies and shift preferences. Incumbent employees in such jobs shall also use their company seniority when in competition with such females.

4. Affidavit of Gerald R. Carley, dated September 15, 1977.

5. Government Requirements of Crown Zellerbach, Part I, No. 6.

## II

The Executive authority over procurement practices has long been recognized and is specifically authorized by Congress with respect to direct federal procurement. In pertinent part, the Federal Property and Administrative Services Act, 40 U.S.C. § 486(a), provides:

The President may prescribe such policies and directives, not inconsistent with the provisions of this Act, as he shall deem necessary to effectuate the provisions of said Act, which policies and directives shall govern the Administrator and executive agencies in carrying out their respective functions hereunder.

In *Farkas v. Texas Instrument, Inc.,* 5 Cir. 1967, 375 F.2d 629, 632 note 1, cert. denied, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471, the court held that Executive Order 10925, the predecessor of Executive Order 11246, is specifically authorized by this statute. See also, *Contractors Association of Eastern Pennsylvania v. Secretary of Labor,* 3 Cir. 1971, 442 F.2d 159, 170, cert. denied, 1971, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95.

Every court before which the issue has come has held that Executive Order 11246, like its predecessor Executive Order 10925, has the force and effect of law. *Contractors Association of Eastern Pennsylvania v. Secretary of Labor, supra ; United States v. Local 189, United Papermakers & Paperwork.,* E.D.La.1968, 282 F.Supp. 39, 43, aff'd., 5 Cir. 1969, 416 F.2d 980, cert. denied, 1970, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100; *Southern Illinois Builders Association v. Ogilvie,* S.D.Ill.1971, 327 F.Supp. 1154, aff'd., 7th Cir. 1972, 471 F.2d 680. See also, *Farkas v. Texas Instruments Co., supra ; Farmer v. Philadelphia Electric Co.,* 3 Cir. 1964, 329 F.2d 3.

█ Likewise, it is well established that regulations issued by government agencies, pursuant to appropriate federal law, themselves have the force and effect of law unless they are in conflict with the authorizing provisions. See *Paul v. United States,* 1963, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292; *Leslie Miller v. Arkansas,* 1956, 352 U.S. 187, 77 S.Ct. 257, 1 L.Ed.2d 231; *Maryland Casualty Co. v. United States,* 1920, 251 U.S. 342, 349, 40 S.Ct. 155, 158, 64 L.Ed. 297; *Ex parte Sackett,* 9 Cir. 1935, 74 F.2d 922, 923; *Williams v. Commissioner of Internal Revenue,* 8 Cir. 1930, 44 F.2d 467, 468–469; *Daeuffer-Liberman Brewing Co. v. United States,* 3 Cir. 1929, 36 F.2d 568, 570; *G. L. Christian and Associates v. United States,* 1963, 160 Ct.Cl. 1, 7, 312 F.2d 418, 424, reh. denied, 160 Ct.Cl. 58, 320 F.2d 345; *Barclay v. United States,* 1964, 166 Ct.Cl. 421, 430, 333 F.2d 847, 856.

Pursuant to Section 202 of the Executive Order 11246, each government contractor or prospective contractor who is not exempt [6] from the provisions of the Executive Order agrees, as a condition of his contract with the United States, to the following:

(1) The contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The contractor will take affirmative action to ensure that applicants are employed and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship . . .

(4) The contractor will comply with all provisions of Executive Order No. 11246 . . . and of the rules, regulations, and relevant orders of the Secretary of Labor.

(6) In the event of the contractor's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or

---

6. The Secretary of Labor has exempted government contractors who do less than $10,000 annual business with the United States from the coverage of Executive Order 11246 [41 CFR 60–1.5(a)]. That exemption is not applicable here.

suspended in whole or in part and the contractor may be declared ineligible for further government contracts in accordance with procedures . . . and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 . . . or by rule, regulation, or order of the Secretary of Labor . . .

The Executive Order also provides for compliance reports (Section 203) and investigations of the contractor by the Secretary of Labor (Section 206). Section 208 authorizes the Secretary of Labor to provide for hearings prior to imposing sanctions, and specifically prohibits any order for "debarment" from further government contracts under Section 209(a)(6) of the Order "without affording the contractor an opportunity for a hearing."[7] However, Section 211 provides that, if the Secretary of Labor so directs:

> Contracting agencies shall not enter into contracts with any bidder or prospective contractor unless the bidder or prospective contractor has satisfactorily complied with the provisions of this Order or submits a program for compliance acceptable to the Secretary of Labor or, if the Secretary so authorizes, to the contracting agency.

Pursuant to the powers granted him in Section 201, the Secretary of Labor has issued regulations implementing the Executive Order. See 41 CFR, Part 60.[8]

The Secretary's regulations, 41 CFR Part 60–1.20(d), provide that a bidder must be found to be in compliance with both 41 CFR Part 60–2, and 41 CFR Part 60–1.20(b) to be eligible for an award of a contract exceeding $1,000,000 in value. The regulations require the development of an affirmative action program, and establish standards and guidelines for the design and implementation of such a plan, 41 CFR Part 60–2, including regulations on sex discrimination, 41 CFR 60–20. Where deficiencies are found, reasonable efforts must be made to secure compliance through conciliation and persuasion, 41 CFR 60–1.20(b). Before the contractor can be found to be in compliance with the Executive Order, it must make a specific commitment in writing to correct the deficiencies that includes the precise action to be taken and the dates for completion. The Secretary of Labor has also provided procedures for determining "responsibility" for the award of government contracts (See generally 41 CFR Part 60–2.2(b) and (c)).[9]

If a bidder is determined to be non-responsible more than once, 41 CFR Part 60–2.2(b) requires that the compliance agency request that enforcement proceedings be initiated pursuant to 41 CFR 60–1.26. The Director of OFCCP interprets 41 CFR 60–2.2(b) as allowing the "pass-over" of a bidder for the award of no more than two contracts for the same deficiency at a given establishment without providing the opportunity for a hearing. The Director further interprets 41 CFR 60–2.2(b) as requiring that, where two such pass-overs have occurred, a hearing is required prior to any additional pass-overs for the same deficiency at a given establishment. See the Affidavit of Weldon Rougeau, dated June 18,

---

7. In addition, Congress has provided in Section 718 of Title VII of the Civil Rights Act of 1964, as amended:

No government contract, or portion thereof, with any employer shall be *denied, withheld,* terminated, or suspended, by any agency or officer of the United States under any equal employment opportunity law or order, where such employer has an affirmative action plan which has previously been accepted by the government for the same facility within the past twelve months without first according such employer full hearing and adjudication . . . ." 42 U.S.C. § 2000e–17. (emphasis supplied.)

8. Except for his regulations-making power, the Secretary of Labor has assigned responsibility for enforcement of the Executive Order to the Director of the Office of Federal Contract Compliance Programs (OFCCP) [41 CFR 60–1.2].

9. Where a prospective contractor is determined to be "nonresponsible" for the award of a government contract, the prospective contractor has the right to request, as Crown did, a determination by the Director of OFCCP that the responsibility of the bidder raises "substantial issues of law or fact . . . to the extent that a hearing is . . . required . . . ."

1977. Hence, the limited issue presented is whether the regulations or due process require a hearing prior to the first two pass-overs of Crown.

Section 208(b) of the Executive Order provides:

No order for debarment of any contractor from further Government contracts under Section 209(a)(6) shall be made without affording the contractor an opportunity for a hearing.

Crown contends that the "pass-over" of even a single contract constitutes a "debarment" and thus requires a prior hearing.

41 CFR 1–1.601–1(a) provides:

"Debarment" means, in general, an exclusion from government contracting and subcontracting for a reasonable, specified period of time commensurate with the seriousness of the offense or the inadequacy of employment . . . the term "debarment" also means an exclusion by reason of ineligibility . . . for an indefinite · period of time pending the elimination of the circumstance for which the exclusion was imposed.

 The government contends that its pass-over is merely a nonresponsibility determination pursuant to 41 CFR Part 60–2.2(b) and not a "debarment". The nonresponsibility determination relates solely to the particular procurement for which the determination is being made and does not extend, as a "debarment" would, beyond the particular procurement. Hence, the Comptroller General has held Executive Order 11246:

. . . authorizes contracting agencies to refrain from entering further contracts with any noncomplying contractor and requires that no order for debarment be made without affording the contractor an opportunity for a hearing. In our opinion the determination of nonresponsibility in this case does not constitute an "order for debarment" from further contracts within the meaning of the Executive Order. 551 Comp.Gen. 551, 555 (B–174816, March 2, 1972).

This interpretation is entitled to deference by this court. See e.g., *Udall v. Tallman*, 1965, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616; *Power Reactor Per. Corp. v. Int. U. of El., Radio & Mach. Workers*, 1961, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924; *Shell Oil Co. v. FPC*, 5 Cir. 1974, 491 F.2d 82, 88.

Similarly, a district court specifically held this interpretation of 41 CFR Part 60–2.2(b) was not violative of Section 208 of the Order:

Under Section 60–2.2(b) the finding of nonresponsibility is permissible without a prior hearing . . . The only requirement for a hearing under the Executive Order is in a debarment case. A debarment is a total bar to receipt of a contract for a period of time, not a single finding of nonresponsibility. It has been held that a single determination of nonresponsibility does not result in a *de facto* debarment because its effect does not extend beyond the contract with respect to which the nonresponsibility was found. See e.g., *Washington Moving and Storage Co. v. Sampson*, D.D.C., June 20, 1973, 18 CCF ¶ 82,336 at 87,637; Comp.Gen.Dec. No. B–175845, March 9, 1973, 18 CCF ¶ 82,110 at 87,342.

*Commercial Envelope Mfg. Co. v. Dunlop*, S.D.N.Y. 1975, 11 FEP Cases 117, 119–120. But see, *Crown Zellerbach Corp. v. Wirtz*, D.D.C.1968, 281 F.Supp. 337.

A nonresponsibility determination is predicated upon the present inability of the company to comply with the equal employment clause of the prospective contract. It is not a retributive sanction based upon past conduct, for which a hearing would be required. The responsibility procedures of 41 CFR Part 60–2.2(b) are not limited to contractors who have been awarded prior federal contracts, but apply as well to bidders who are seeking their first federal contract.

 The Executive Order contains no language from which it may be inferred that contracting agencies are required to afford notice and a hearing to a potential contractor concerning whether it can comply with the specifications of a contract.

The government has the right to specify the terms on which it will let contracts; its specifications may relate to the kind and quality of the product, to the potential contractor's ability to produce a particular quantity of it, or to produce it in a certain period of time. Its specifications may also extend to forbidding the contractor to produce the product in a manner that does not comply with the government's policies, such as a prohibition against denying employment to females or against denying them a certain kind of seniority.

Accordingly, Section 208 of the Executive Order does not compel a hearing under these circumstances. The Director states that he will accord a hearing whenever there have been two such pass-overs. For reasons that shall be detailed subsequently, due process requires no more in these circumstances, and this interpretation of Section 208 is consonant with constitutional guarantees.

### III

■ The government has "the unrestricted power to determine with whom it will deal and to fix the terms and conditions upon which it will make needed purchases." *U. S. v. New Orleans Public Service, Inc.*, 5 Cir. 1977, 553 F.2d 459, 469. Hence, Crown lacks either a statutory entitlement to contract renewal, *Myers & Myers, Inc. v. United States Postal Serv.*, 2 Cir. 1975, 527 F.2d 1252, 1258; *Gonzalez v. Freeman*, D.C. Cir. 1964, 334 F.2d 570, 574, or a reasonable expectation that its business relation with the government has become permanent in nature. See *Perry v. Sindermann*, 1972, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570; *Board of Regents of State Colleges v. Roth*, 1972, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548; *Myers, supra* ; *Rainbow Valley Citrus Corp. v. Federal Crop Ins. Corp.*, 9th Cir. 1974, 506 F.2d 467. Thus, if there is any basis for its claimed right to a hearing, this would result from those due process re-

quirements that apply where the government is imposing a sanction. See *Morrissey v. Brewer*, 1977, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484.

■ If the government's action depends upon an adjudicative determination, a trial-type hearing is ordinarily required. *Goldberg v. Kelly*, 1970, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed. 287. But if the governmental action is legislative in nature, then a hearing is usually not required. The distinction is often a difficult one to draw, and depends in large measure on whether the government is acting only with respect to a particular party or is seeking to promulgate a rule of general applicability.

41 CFR Part 60–2, Section 60–2.11, sets forth criteria to be used in determining whether government contractors are employing females in a nondiscriminatory fashion. In the jargon of the regulation, failure to do this is called "underutilization." Additional regulations govern the formulation of affirmative action plans for such contractors. These rules are applied to all potential contractors to determine if they meet government responsibility requirements.

According to the court in *Dunlop, supra,* 11 FEP Cases, at 120, "No constitutional right to a hearing on responsibility has ever been found in cases of government contract determinations." [10] In *Myers, supra*, the court reasoned:

> [T]he Postal Service is free to refuse to renew any particular . . . contract without first granting a hearing. But . . . [where plaintiffs] have alleged facts which indicate that the Postal Service refusals to renew the . . . contracts in their case were part of a *"sanction"* taken against them for claimed irregularities in their firm's operating procedures, [they may be entitled to a hearing]. *Myers & Myers, Inc., supra*, 527 F.2d at 1258. (emphasis added)

---

**10.** In *Horne Bros., Inc. v. Laird*, 1972, 150 U.S. App.D.C. 177, 463 F.2d 1268, the court held that a party suspended from government contracting for a period of one year or more was entitled to a hearing within thirty days of its

suspension. However, under the regulation in *Horne*, ASPR § 1.650–1, suspension was a sanction for commission of a crime or other causes of a serious and compelling nature.

The government's action here would require notice and a hearing only if it is imposing a sanction for prior conduct, not if it is merely setting forth conditions that must be followed in all future contracts.

The government's requirements are based solely upon the present composition of Crown's workforce and on its present lack of an acceptable seniority system. This is not a sanction for alleged sex discrimination in the past. The sole concern of the government is whether Crown, as a potential contractor, will commit itself to particular goals in employment composition and to a seniority system that would assure the employment of females in performing future contracts.

The proposed seniority system does not impose conditions patently unreasonable or capricious. It requires that men and women alike utilize their company seniority when competing against each other. Crown is free not to employ such a system, as it is free not to contract with the government. But the government is entitled to set the specifications of its contracts, with respect to both the product it desires and the conditions of production.

■ The requirements imposed upon Crown have been formulated into regulations that are applicable to all similar government contractors. The government has indicated it will accommodate any peculiar problems of Crown in formulating an acceptable affirmative action program. (Affidavit of Weldon Rougeau, dated September 19, 1977.) It will also afford a hearing after two pass-overs. It has afforded Crown a substantial issue of law and fact determination with regard to the identity of individual affected class members and the relief due them on an individual basis. Under the circumstances, this is all the process that is due. The government is entitled to set its contractual requirements without a hearing either for formulating the precise specifications, or determining whether each potential contractor can adequately meet those specifications. A hearing is necessary only when its refusal to

contract is in retribution for past misconduct. This is properly "adjudicative."

## IV

■ Crown also contends that Section 211 of the Executive Order, which authorizes the Secretary of Labor to direct contracting agencies not to contract with bidders or prospective contractors who do not submit an acceptable program for compliance, was promulgated without compliance with the requirements of notice and hearing procedures set forth in Section 553 of the Administrative Procedure Act, 5 U.S.C. § 553. Rules adopted without complying with this provision may be declared invalid. *Morton v. Ruiz*, 1974, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270.

However, Section 553 by its own terms does not apply to "matter[s] relating to . . . contracts". Crown contends that this exemption is not applicable because the Secretary of Labor has provided:

> [I]n applying the rule-making provisions of the APA, the exemption therein for rules relating to . . . contracts shall not be relied upon as a reason for not complying with the notice and public participation requirements thereof. The policy is intended to carry out Recommendation No. 16 of the Administrative Conference of the United States. 29 CFR 2.7.

■ However, this regulation did not become effective until July 10, 1971, after enactment of Section 211 of the Executive Order on September 24, 1965. The regulation contains no indication it was to be applied retroactively. It does not require, either in terms or by implication, that established rules were to be resubmitted through rule-making procedures.

Additionally, 41 CFR Parts 60–1 and 60–2 detailing the obligations of contractors and of affirmative action programs were promulgated prior to the Secretary's decision not to invoke the contract exemption. Moreover, although not required to do so,

the government followed rule-making procedures with regard to these regulations.[11]

Finally, in this regard, Crown contends that the government's formulation of a plan for the conversion of its personnel policies into the proposed seniority system is but another *de facto* exercise of rule-making authority for which rule-making procedure was not followed. The government contends that it was not formulating new rules but merely applying existing rules to Crown's particular circumstances.

■■■ "No rules can determine their own application." [12] Although one set of rules may govern the application of another set of rules, ultimately a judgment must be made to apply these rules to particular circumstances. If that judgment does not involve formulation of principles that will govern other situations, it is not rule-making. When existing rules are applied to circumstances to which one would not reasonably contemplate their application, then the judgment itself may constitute *de facto* rule-making. Here, however, the application of the rule to the circumstances found to exist is logical and direct. Neither the Administrative Procedures Act nor due process require that the full panoply of rule-making procedures be imposed upon such an application of existing regulations. See *FPC v. Texaco Inc.*, 1964, 377 U.S. 33, 39, 84 S.Ct. 1105, 1109, 12 L.Ed.2d 112.

Accordingly, Crown's contention that the regulations invoked by the Secretary and his actions in applying those regulations violate the Administrative Procedures Act is without merit.

## V

■■■ Finally, it is contended that imposing a company seniority system conflicts with a general Congressional policy set forth in § 703(h) of Title VII of the Civil Rights Act, 42 USC § 2000e-2(h). The provision provides:

> Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority . . . system . . . provided that such differences are not the result of an intention to discriminate because of race . . . sex . . . or national origin . . ..

Crown contends the provision evidences a Congressional policy to preserve bona fide seniority systems, and that this is further evidenced by the Supreme Court's view of Congressional intent as discussed in *Teamsters v. United States*, 1977, 431 U.S. 324, 97 S.Ct. 1843, 1862–1863, 52 L.Ed.2d 396, and in *Trans World Airlines, Inc. v. Hardison*, 1977, 432 U.S. 63, 97 S.Ct. 2264, 2275, 53 L.Ed.2d 113.

11. On February 15, 1968, comments with regard to 41 CFR Part 60–1 were invited in the notice of proposed rule-making which was published by the Secretary of Labor in the Federal Register on that date (33 FR 3000). On May 28, 1968, 41 CFR Part 60–1 was adopted in final form by the Secretary and published at 33 FR 7804. The regulations became effective in part on July 1, 1968, and in part 120 days after July 1.

Part 60–2, also known as "Order No. 4" was originally published, without inviting comment, on February 5, 1970 (35 FR 2586). However, on August 31, 1971, proposed "Revised Order No. 4," which expanded "Order No. 4," *inter alia*, specifically to require affirmative action measures such as goals and timetables for women as well as minorities, was published in its entirety at 36 FR 17444. The Secretary of Labor provided 30 days during which interested persons were invited to submit written com-

ments, suggestions or objections to the proposed amendment. On December 4, 1971, after having considered all relevant material submitted, the Secretary adopted 41 CFR Part 60–2 ("Revised Order No. 4") in final form (36 FR 23152) in which he stated:

Having considered all relevant material submitted, I have decided to and do hereby amend Chapter 60 of Title 41 of the Code of Federal Regulations by adding a new Part 60–2, . . .

Proposed amendments of 41 CFR Parts 60–1, 60–2, and 60–30 were published for comment by the Secretary of Labor in the Federal Register on September 17, 1976 (41 FR 40340) and were finalized on January 18, 1977 (42 FR 3454) effective in part on January 18 and in part on February 17, 1977.

12. Wittgenstein, quoted in Kessler and Gilmore, *Contracts*, 2d Ed., at 653.

However, *Teamsters,* merely held that private employers do not violate Title VII by failing to provide retroactive seniority for persons who were discriminated against prior to the effective date of Title VII. *Teamsters* did not in any sense indicate that retroactive seniority would violate the Act. In fact, it acknowledged that persons who were discriminated against after the enactment of Title VII are due such retroactive seniority.

Similarly, *T.W.A.* held that failure to provide for exceptions to a plan of seniority in order to accommodate religious practices of some individuals does not violate the Act; it did not suggest that a plan that did accommodate such preferences would violate the Act. In each instance, the employer is not mandated to act affirmatively, but it is not forbidden to do so if it chooses.

But even assuming that the court in *Teamsters* or *T.W.A.* discerned a Congressional policy, expressed in § 703(h) of Title VII, in favor of "bona fide seniority plans," that policy is not inconsistent with a policy of requiring such seniority as a basis for contracting with a federal agency. The government may surely seek to promote actions that it considers important by means other than making a failure to act on the part of all employers a violation of the law.

■ Moreover, Title VII is intended to govern only private contracts, and not contracts with the government. For this reason, the Court of Appeals in *Contractors Assoc. of Eastern Pennsylvania v. Secretary of Labor,* 3 Cir. 1971, 442 F.2d 159, cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95, held that the provisions of Title VII are inapplicable to an Executive Order.

Accordingly, Crown's contention that the government has contravened the policy expressed in Section 703(h) of Title VII is without merit.

### VI

■ This court is mindful that there have been recent layoffs at the plants in question, that there is general unemployment in the area where they are located, and that existing collective bargaining agreements entered in good faith may preclude adoption of the proposed seniority system because it protects the present workforce from layoffs. The court is aware that these agreements may have been entered into without any sex-based animus. But it is not for this court to formulate the policy of the Executive. The government is free to set the terms and conditions of its contracts, and potential contractors are free not to contract with the government if its terms are undesirable.

Accordingly, Crown's Motion for a Preliminary Injunction is DENIED.