**FEDERATION FOR AMERICAN IMMIGRATION REFORM (FAIR), Plaintiff,**

v.

**Edwin MEESE, the Attorney General of the United States, et al., Defendants.**

No. 85–6078–CIV.

United States District Court, S.D. Florida, Miami Division.

Sept. 12, 1986.

Ronald Spann, Fort Lauderdale, Fla., Barnaby Zall, Washington, D.C., for plaintiff.

Thomas W. Hussey, Asst. Director, Office of Immigration Lit., Washington, D.C., Tammy Fox-Isicoff, Sp. Asst. U.S. Atty., Miami, Fla., for defendants.

## MEMORANDUM DECISION

SCOTT, District Judge.

### BACKGROUND

The Plaintiff, Federation for American Immigration Reform (FAIR), is a non-profit membership organization concerned with the economic and social effects of immigration. FAIR advocates the interests of its members, approximately 15,000 of whom reside in South Florida. The Defendant, Edwin Meese, Attorney General of the United States, is by law entrusted to enforce the immigration laws. 8 U.S.C. 1103(a). Under the Immigration and Nationality Act (INA) the Attorney General has delegated his authority to the Co-defendants, the Immigration and Naturalization Service (INS), Alan Nelson who is the Commissioner of INA and Perry Rivkind who is the District Director of INS for District VI, the South Florida District. All Defendants will be collectively referred to as the "Attorney General."

By this action, FAIR seeks declaratory and injunctive relief contending that the Attorney General is applying the immigration laws in an illegal manner. Specifically, FAIR demands that the immigration benefits extended to Cuban Nationals under the special adjustment provisions of the Act of 1966 be subjected to the "visa-charging" requirement of the general provisions available to aliens of all nationalities under the INA of 1952, as amended. Act of November 2, 1966 Pub.L. No. 89–732, 80 Stat. 1161, 8 U.S.C. § 1255 note. The Attorney General's response is twofold: First, FAIR is without standing to challenge the Government's action; and, Sec-

ond, the Cuban Adjustment Act (CAA) does not require a "charge-back" of those Cubans whose applications have been adjusted against the numerical limitations processed under the Act. Each argument will be considered respectively.

## STANDING

The doctrine of standing arises from the "case or controversy" requirement of Article III of the Constitution. *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). "Standing doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the respresentative branches, and the requirement that a plaintiff's complaint fall within the zone of interest protected by the law invoked." *Id.* at 3315 (citing *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982)). To comport with the standing requirement, Plaintiff must allege a personal injury that is fairly traceable to the Defendant's allegedly unlawful conduct which is likely to be redressed by the requested relief. To borrow from Justice O'Connor in *Allen v. Wright, supra,* the standing inquiry requires a judicial examination of the following:

1. *"Is The Injury Too Abstract Or Otherwise Not Appropriate To Be Considered Judicially Cognizable?"*

FAIR purports to have been irreparably and substantially harmed by the Attorney General's actions. Plaintiff alleges this harm has manifested itself in a variety of forms in South Florida ranging from "an increas[e] in community tensions and racial or ethnic animosity" to "increasing Plaintiff's fears and commensuratively reducing Plaintiff's personal liberties and freedom of activity in the community."

FAIR relies heavily on *International Union of Bricklayers and Allied Craftsman v. Meese,* 761 F.2d 798 (D.C.Cir.1985) (*Bricklayers I*) and *International Union of Bricklayers and Allied Craftsman v. Meese,* 616 F.Supp. 1387 (N.D.Cal.1985) (*Bricklayers II*). In both *Bricklayers* cases, plaintiffs were members of a union which had claimed direct economic loss because of the Attorney General's issuance of visas to foreign laborers who were subsequently employed at worksites where union members were "ready, willing and able to perform work." *Bricklayers I,* 761 F.2d at 800, *Bricklayers II,* 616 F.Supp. at 1398. In *Bricklayers I* the circuit court determined that "a competitive injury resulting from lost economic opportunities could form the foundation necessary for standing." 761 F.2d 802. Similarly, in *Bricklayers II,* the district court recognized that "[s]tatutes designed for the protection of the American worker create sufficient 'zone of interest' to confer upon those workers a proper ground for standing." 616 F.Supp. at 1397 (quoting *Bricklayers I*).

A thorough review of Plaintiff's allegations reveals that no such competitive injury is even remotely cognizable for FAIR and its members under the CAA. Neither FAIR nor any of its individual members claim a direct interest as parties to any past or pending adjudications under the CAA or under the INA in general. Plaintiff is no more than a third party to the administrative process by which individual Cubans are determined to be eligible for adjustment of their status to that of an alien lawfully admitted for permanent residence. 8 U.S.C. 1255 (1984). FAIR is simply not the economic beneficiary of any specific legislation. Consequently, no "zone of interest" exists under the statute to confer upon FAIR a proper ground for standing.

2. *"Is The Line Of Causation Between The Illegal Conduct And Injury Too Attenuated?"*

As to the second prong, FAIR must show that its alleged injury is "fairly traceable" to the Defendant's allegedly unlawful con-

duct. *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984). Assuming *arguendo,* that FAIR could demonstrate some cognizable personal injury, the causal connection is too attenuated.

First, FAIR fails to acknowledge that the CAA does not provide for the admittance of Cuban immigrants into this country but rather allows for those Cubans who are already present in the United States to apply to INS to have their status adjusted to that of a lawful alien admitted for permanent residence. Second, if INS were to institute a policy consistent with FAIR's position of charging-back adjustments, the Cubans who have already been adjusted would still be eligible to bring in their family members. FAIR's purported injury would exist notwithstanding INS' procedure of making adjustments in a manner consistent with FAIR's suggestion. Lastly, FAIR fails to identify any specific statutory provision or government policy which requires Cubans adjusted under the Act to reside in South Florida. FAIR completely ignores the common fact that Florida is a desirable place to live. Indeed, for many years there has been a constant flow of immigration into Florida from not only Cuba but also from other countries as well as from citizens of the United States.

Addressing this kind of illusory relationship between conduct and injury, the Supreme Court has repeatedly stated that "an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." *Allen v. Wright,* 104 S.Ct. at 3326; *see e.g. Valley Forge,* 454 U.S. at 464, 102 S.Ct. at 752; *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); and, *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). Quite simply, FAIR cannot trace any of its "generalized greivances" to the actions of the Attorney General.

3. *"Is The Prospect Of Obtaining Relief From The Injury As A Result Of A Favorable Ruling Too Speculative?"*

As to the third prong, FAIR must make a showing of "distinct and palpable" injury.

*Allen v. Wright,* 104 S.Ct. at 3325; and *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). FAIR fails to make the requisite showing as to redressability. Its claims are merely "conjectural" and "hypothectical". They are thus insufficient as a matter of law. *Allen v. Wright,* 104 S.Ct. at 3325 (citing *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)).

Here, assuming this Court were to provide FAIR with the requested injunctive relief, Plaintiff would not benefit. FAIR has candidly admitted during oral argument that whatever the Attorney General has done in the past is beyond the scope of any relief which this Court could provide. To borrow from an oft-quoted phrase, Plaintiff seeks to "close the immigration door after the immigrants have been adjusted."

Reducing this case to its lowest denominator, the gravamen of the claim lies in Plaintiff's dissatisfaction with the Government's open-ended immigration policy. Our courts have long recognized that matters of immigration policy are best decided by the Legislative and Executive branches. *See, Fiallo v. Bell,* 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977); and, *Mathews v. Diaz,* 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). As stated in *Laird v. Tatum,* 408 U.S. 1, 15, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972):

> Carried to its logical end [Plaintiff's] approach would have the federal courts as vitually continuing monitors of the wisdom and soundness of Executive action; such a role is appropriate for the Congress acting through its committees and the "power of the purse"; it is not the role of the judiciary, absent actual present or immediately threatened injury resulting from unlawful governmental action.

This Court is compelled to follow such mandates. Accordingly, the Court concludes that the allegations of the com-

plaint are insufficient to support FAIR's claim for standing to challenge the Attorney General's actions under the Cuban Adjustment Act. The issues which FAIR seeks to address are better directed to more appropriate forums—the Congress and Executive of the United States. Although FAIR has no standing to challenge the Attorney General's actions, the Court nonetheless will address the substantive issue in light of the far reaching consequences of this claim.

### CUBAN ADJUSTMENT ACT

The basic provision available to all aliens, regardless of nationality, for adjustment of status is provided in the INA of 1952. *See* 8 U.S.C. § 1255. Over the past several decades, Congress has supplemented that provision with special statutes addressing the needs of particular alien groups or nationalities. *See e.g. Virgin Islands Nonimmigrant Alien Adjustment Act of 1982,* 8 U.S.C. § 1255 (historical) note and *Indochina Refugees, Adjustment of Status,* 8 U.S.C. § 1255 (historical) note.

In 1966, Congress enacted the CAA providing a separate mechanism by which Cuban entrants could secure the right of permanent residence in the United States. Act of November 2, 1966, Pub.L. No. 89–732, 80 Stat. 1161, 8 U.S.C. § 1255 note. The Act provided, notwithstanding the collateral provisions of the INA which impose numerical limitations on those aliens whose status is adjusted, any Cuban who has been inspected, admitted or paroled into the United States subsequent to January 1, 1959 and who had been physically present in this country for two years is eligible to be adjusted to that of an alien lawfully admitted for permanent residence. *Id.* The INS began subsequently a policy of charging against the numerical quota limitations a number equal to those Cubans who were adjusted under the Act of 1966.

In 1976, however, the Department of Justice concluded that persons adjusted under the legislation were not properly chargeable against the immigration quotas. On August 31, 1976, Attorney General Levi ordered INS to alter its policy. *See* Memorandum for the Attorney General from Assistant Attorney General Scalia, Office of Legal Counsel (August 31, 1976); Letter from Attorney General Bell to Rep. Eilberg (March 9, 1977). Thereafter, Congress amended the CAA to provide that no charge be made against the Western Hemisphere quotas for adjustments made

> *"in the case of any alien who is physically present in the United States on or before the effective date of the ... (a)mendment ..."* (emphasis supplied) Pub.L. No. 94–571, 90 Stat. 2703, 8 U.S.C. 1255 note.

Interpretation of this language is the pivotal issue in this case: FAIR contends this language only permitted the Attorney General to not charge-back those Cubans who were in the United States on January 1, 1977, the effective date of the amendment. In effect, FAIR seeks to subject the special benefits of the Act of 1966 to the numerical limits which were originally set forth in the 1952 legislation. The Attorney General argues conversely that the effective date of FAIR's claim would be to repeal the entire CAA of 1966. Defendant adds that to accept FAIR's interpretation of the language would be to frustrate the entire intent of the Congress. *United States v. Anaya,* 509 F.Supp. 289, 297 (S.D. Fla.1980).

Plaintiff and Defendant have filed cross-motions for summary judgment. The parties agree that there are no material issues of fact. This case presents a legal issue which is ripe for determination. Fed.R. Civ.P. 56(c). In light of the conflicting positions, this Court's obligation is to review the legislative history in order to glean the intent of Congress.

The Attorney General has concluded and the administrative practice consistently has been that the adjustments under the special provisions of the CAA are not chargeable against the present quotas, *see Cuddihy Declaration* at par. 9. Thus an interpretation is entitled to considerable, if not controlling, difference. *Mathews v. Diaz,* 426 U.S. 67, 81–82, 96 S.Ct. 1883, 1892, 48

L.Ed.2d 478 (1976); *see also United States v. National Assoc. of Securities Dealers,* 422 U.S. 694, 719, 95 S.Ct. 2427, 2442, 45 L.Ed.2d 486 (1975).

■ The legislative history supports the administrative interpretation and practice. During the hearings preceding the passage of the Act of 1966, the subject of whether quotas would be applied to Cubans was addressed by Congressman Cahill and Under Secretary Ball:

> Mr. Cahill: The legislation would be open-ended would it not; there would be no termination; and there could be an unlimited number [of Cubans]?
>
> Mr. Ball: Yes, although the Attorney General would apply the same screening procedures he would apply to anyone else who comes in on an immigrant visa ...
>
> Mr. Cahill: Now it seems we are adopting a permanent policy. We are really saying in effect that we will accept all Cubans who want to come into the United States regardless of the number for however long they want to come in ...

*See Hearings on the Adjustment of Status for Cuban Refugees before a Subcommittee of the House Judiciary Committee,* 89th Cong.2d Sess. pp. 15–18. This history evinces a Congressional intent to implement an open-ended adjustment policy for Cuban entrants wishing to become permanent residents.

In 1976, similar discussions in the House hearings prior to the enactment of Section Five of the CAA reconfirmed a Congressional desire to continue the adjustment of Cubans without charging back those aliens against the Western Hemisphere quotas. Representatives of the Visa office submitted papers pursuant to a House request following the testimony of General Leonard Chapman, Jr., of the INA and Mr. Leonard Walentcynowicz, Administrator of the Bureau of Security and Consular Affairs. When comparing the proposed legislation (Section Five) which would specifically eliminate the charge-backs with the (then) current practice of charging-back,

the Visa Office concluded that "[u]nder the existing system this trend [of 20,000 or more new entrants a year] is likely to continue for at least the next five years...." *House Hearings, supra* at 369. This history illustrates that because of the continuing flow of Cubans into this country, Congress recognized that the pre-existing procedure of charging-back Cuban adjustments could not be effectively retained.

In short, nothing in the 1976 Amendment required that any applicants be charged against the collateral quotas, regardless of entry dates. The operative provisions of Section One of the Act—making adjustments available without limitations to Cubans who have entered the United States "subsequent to January 1, 1959 ... and [have been] physically present in the United States for at least two years"—were left unchanged.

FAIR's argument of negative inference requires more than a statutory reading in between the legislative lines. If accepted, it would effectively repeal the Adjustment Act itself, a result forbidden by settled principles of statutory construction. *See, e.g.,* Sands, *Sutherland Statutory Construction,* 23,09 (4th ed. 1984). To interpret the statute as FAIR contends would also repeal the Act as to the hundreds of thousands of Cubans who have entered in the past eight years. *See Cuddihy Declarations* at par. 5 and 10. It would call into question the status of the 127,000 Cuban entrants who have been adjusted without charge during the same period as well as the status of aliens of other nationalities who benefited under the collateral provisions of the INA from the greater availability of visas resulting from the lack of Cuban claims. *Id.*

In 1980, Congress continued to acknowledge the viability of the Act by reducing the physical presence prerequisite from two years to one. Basic principles of statutory construction dictate that subsequent enactments can be used to interpret pre-existing legislation. *May Dept. Stores Co. v. Smith,* 572 F.2d 1275, 1278 (8th Cir.1978);

*Republic Steel Corp. v. Costle,* 581 F.2d 1228, 1232 (6th Cir.1978).

Lastly, the Court notes that INS has filed annual reports detailing the number of Cuban refugees who have been granted adjustments which are exempt from the numerical limitations of the general provisions of any of the various special provisions. *See INS 1977 Annual Report: Immigration and Naturalization Service.* Such an unbroken history of Congressional awareness of and acquiesence in the Attorney General's consistent practice of exempting adjustments under the special provisions of the CAA from the visa limitations is sufficient to dispose of Plaintiff's claim. *Haig v. Agee,* 453 U.S. 280, 291, 101 S.Ct. 2766, 2773, 69 L.Ed.2d 640 (1981); *Zemel v. Rusk,* 381 U.S. 1, 11, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179 (1965). In summary, there is simply no support for FAIR's argument that the 1976 amendment to the CAA must be construed to have eliminated the initial "exemption" and therefore subjected Cuban adjustments to the numerical limitations imposed under the general provisions of the Act.

## REMAINING CLAIMS

■ FAIR asserts two final statutory contentions. First, FAIR contends that the Attorney General failed to comply with the notice and comment requirements of the Administrative Procedure Act (APA). This argument lacks merit. An examination of APA reveals that the Act does not require notice and comment where the agency actions are limited to non-substantial matters such as "interpretative rules, general statement of policy, or rules of agency organization procedure or practice." 5 U.S.C. 553(b). In this case, the INS resumption of active processing of all Cuban adjustment applications falls within the exemptions of the APA's rulemaking obligations. Notice and comment is not required because the "event" in question is merely a continuation of past policy practice. *Crown Zellerbach Corp. v. Marshall,* 441 F.Supp. 1110, 1120 (E.D.La.1977).

■ Secondly, FAIR argues that the Attorney General failed to prepare an environmental impact settlement in accordance with the National Environment Policy Act of 1969 (NEPA) Section 102, 42 U.S.C. 4332 (1970). This contention is also misplaced.

NEPA's primary concern is with the natural environment. *Image of Greater San Antonio, Texas v. Brown,* 570 F.2d 517 (5th Cir.1978). Socio-economic effects are secondary considerations. *Hanly v. Mitchell,* 460 F.2d 640 (2nd Cir.1972), *cert denied,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972); Council on Environmental Guidelines, 40, C.F.R. 1550.9(a)(3)(ii)(1975) ". ... [W]hen the threshold requirement of a primary impact on the physical environment is missing, socio-economic effects are insufficient to trigger an agency's obligations to prepare an Environmental Impact Statement." *Image of Greater San Antonio, Texas v. Brown,* supra at 522.

In the present case, FAIR has made various allegations regarding the impact of Cuban immigration upon South Florida's water supply, sewage and traffic congestion. Such impact averments are, at best, socio-economic. Certainly, such allegations do not constitute a "primary" impact with the meaning of the Fifth Circuit's holding in *Image of Greater San Antonio, Texas v. Brown.* For that reason, Plaintiff's claim must be rejected.

## CONCLUSION

For the foregoing reasons, it is

ORDERED and ADJUDGED as follows:

1. Plaintiff FAIR's Renewed Motions for Preliminary Injunction and for Summary Judgment are *denied* with prejudice;

2. Defendant's Renewed Motion to Dismiss or, Alternatively, for Summary Judgment is *granted.* Final Judgment is entered against Plaintiff, Federal for American Immigration Reform (FAIR) and in favor of Defendants; and,

3. Costs, if any, may be taxed upon appropriate motion.