**INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTSMEN; and Local No. 7, California, International Union of Bricklayers and Allied Craftsmen, Plaintiffs,**

v.

**Edwin MEESE III, Attorney General of the United States; George P. Schultz, Secretary of State of the United States; and Immigration and Naturalization Service, Defendants,**

**Homestake Mining Company of California, a California Corporation, Defendant-Intervenor.**

**No. C–85–1253–CAL.**

United States District Court, N.D. California.

Aug. 28, 1985.

Stephen P. Berzon, Marshal S. Berzon and Michael Rubin, Altshuler & Berzon, San Francisco, Cal., and Sarah Fox, Washington, D.C., for plaintiffs.

Jeffrey L. Bornstein, Asst. U.S. Atty., San Francisco, Cal., for defendants.

Dana Marks Keener, Simmons & Ungar, San Francisco, Cal., for defendant-intervenor Homestake Mining Co.

## OPINION AND ORDER GRANTING SUMMARY JUDGMENT

LEGGE, District Judge.

Plaintiff International Union of Bricklayers and Allied Craftsmen ("International Union") represents approximately 100,000 masonry craftsmen working in the construction industry in the United States. Plaintiff Local No. 7, California, International Union of Bricklayers and Allied Craftsmen ("Local 7") is affiliated with plaintiff International Union in Northern California, and represents masonry craftsmen working in Lake County, California.

Defendants Edwin Meese III ("Attorney General"), George P. Schultz ("Secretary of State"), and the Immigration and Naturalization Service ("INS") are charged with the administration and enforcement of the immigration laws in the United States.[1] Defendant-intervenor Homestake Mining Company of California ("Homestake") is a California corporation, and the owner of the McLaughlin Gold Project in Lake County, California.

Plaintiffs commenced this case on behalf of themselves and their members to challenge the federal defendants' practice of issuing visas to foreign laborers under the authority of INS Operations Instruction 214.2(b)(5), an INS internal agency guideline. Pursuant to that practice, visas are issued to foreign laborers coming to the United States temporarily to work. In this case, visas were issued to foreign laborers who came temporarily to work on the project owned by Homestake. Plaintiffs contend that the practice violates the Immigration and Nationality Act ("Act"), 8 U.S.C. §§ 1101–1524 (1982 & Supp. I 1983), and seek declaratory and injunctive relief to remedy the alleged violations.

The case is now before the court on the parties' cross motions for summary judgment. The court has examined the extensive briefs of the parties, the affidavits and declarations, the record, and the legal authorities. For the reasons set forth below, the court concludes that summary judgment should be entered in favor of plaintiffs.

---

1. Defendants Attorney General, Secretary of State, and INS are collectively referred to herein as the "federal defendants."

## I.

### Statutory and Regulatory Overview

The Act generally charges the Attorney General and the Secretary of State with the administration and enforcement of the immigration laws of the United States. *See* 8 U.S.C. §§ 1103(a), 1104(a). Primary responsibility, however, rests with the Attorney General,[2] and his "determination and ruling ... with respect to all questions of [immigration] law [is] controlling." 8 U.S.C. § 1103(a). *See generally* 1 C. Gordon & H. Rosenfield, *Immigration Law and Procedure* §§ 1.6–1.17 (1985) (examining the Act's administration and enforcement provisions).

Under the Act, an alien seeking to enter the United States is categorized either as an "immigrant" or "nonimmigrant." In most instances, an immigrant seeks permanent residence, and a nonimmigrant seeks only a temporary stay. The Act, however, defines an immigrant as *"every* alien *except* an alien who is within one of the ... classes of *nonimmigrant* aliens." 8 U.S.C. § 1101(a)(15) (emphasis added). Further, the Act provides that every alien is presumed to be an immigrant unless he establishes to the satisfaction of consular and immigration officers that he is entitled to nonimmigrant status. 8 U.S.C. § 1184(b). The distinction between immigrant and nonimmigrant aliens is significant. The Act contains numerical limitations and strict documentary requirements for certain classes of immigrant aliens. In contrast, there are no numerical limitations placed upon the classes of nonimmigrant aliens. *See generally* 1 C. Gordon & H. Rosenfield, *Immigration Law and Procedure* §§ 2.1, 2.5 (1985) (examining the Act's treatment of immigrant and nonimmigrant aliens).

The dispute in the present case centers on the Act's provisions regarding nonimmi-

grant aliens. Section 101(a)(15) of the Act, 8 U.S.C. § 1101(a)(15), sets forth thirteen classes of aliens entitled to nonimmigrant status. The parties have stipulated, however, that only two of those classes are germane to this case.

### A.

### Temporary Visitors for Business

The first class of nonimmigrant aliens relevant here is the "temporary visitor for business" class. Section 101(a)(15)(B) of the Act defines a "temporary visitor for business" as:

> an alien (other than one coming for the purpose of study or of performing skilled or unskilled labor or as a representative of foreign press, radio, film, or other foreign information media coming to engage in such vocation) having a residence in a foreign country which he has no intention of abandoning and who is visiting the United States temporarily for business....

8 U.S.C. § 1101(a)(15)(B). An alien qualifying for this nonimmigrant status is entitled to receive a "B–1" visa. *See* 8 U.S.C. § 1201(a)(2).

Pursuant to his authority under the Act, *see* 8 U.S.C. § 1104(a), the Secretary of State has promulgated a regulation defining the term "business" for purposes of the B–1 "temporary visitor for business" class:

> The term "business", as used in section 101(a)(15)(B) of the Act, refers to legitimate activities of a commercial or professional character. It does not include purely local employment or labor for hire. An alien seeking to enter as a nonimmigrant for employment or labor pursuant to a contract or other prearrangement shall be required to qualify under the provisions of [22 C.F.R.] § 41.-55.[3]

---

**2.** The Attorney General is authorized to delegate his powers under the Act. 8 U.S.C. § 1103(a). Pursuant to that authority, the Attorney General has delegated his powers to the Commissioner of the INS. 8 C.F.R. § 2.1 (1985).

**3.** 22 C.F.R. § 41.55 is a regulation promulgated by the Secretary of State in connection with the H–2 "temporary worker" nonimmigrant class. The "temporary worker" class is the other relevant nonimmigrant class in the present case, and is discussed below.

22 C.F.R. § 41.25(b) (1985). *See also* 22 C.F.R. § 41.25(a) (1985) (specifying factors considered by consular officer in determining whether an alien is classifiable as a "temporary visitor for business").

Among the criteria utilized to determine an alien's eligibility for B–1 "temporary visitor for business" status is INS Operations Instruction 214.2(b)(5), an INS internal agency guideline that is the subject of this dispute. The Operations Instruction provides:

> Each of the following may also be classified as a B–1 nonimmigrant if he/she is to receive no salary or other remuneration from a United States source (other than an expense allowance or other reimbursement for expenses incidental to the temporary stay):
>
> \*      \*      \*      \*      \*      \*
>
> (5) An alien coming to install, service, or repair commercial or industrial equipment or machinery purchased from a company outside the U.S. or to train U.S. workers to perform such service, provided: the contract of sale specifically requires the seller to perform such services or training, the alien possesses specialized knowledge essential to the seller's contractual obligation to provide services or training, the alien will receive no remuneration from a U.S. source, and the trip is to take place within the first year following the purchase.

INS Operations Instruction 214.2(b)(5), reprinted in 4 C. Gordon & H. Rosenfield, *Immigration Law and Procedure* 23–358 to 23–359 (1985).

Pursuant to the Operations Instruction, B–1 visas have been issued to the foreign laborers who came to the United States to work on the project owned by Homestake, and to foreign laborers to do other work throughout the United States.[4] The central issue in this case is whether the Opera-

tions Instruction violates the Act and the regulations promulgated under the Act.

B.

*Temporary Workers*

The second class of nonimmigrant aliens involved here is the "temporary worker" class. Section 101(a)(15)(H)(ii) of the Act defines a "temporary worker" as:

> an alien having a residence in a foreign country which he has no intention of abandoning ... [and] who is coming temporarily to the United States to perform temporary services of labor, if unemployed persons capable of performing such service or labor cannot be found in this country....

8 U.S.C. § 1101(a)(15)(H)(ii). An alien qualifying for this nonimmigrant status is entitled to receive an "H–2" visa. *See* 8 U.S.C. § 1201(a)(2).

The Attorney General is authorized to make the determination concerning the admissibility of an H–2 "temporary worker" applicant after consulting with other government agencies. In this regard, the Act provides that "[t]he question of importing any alien as a nonimmigrant under section 101(a)(15)(H) ... shall be determined by the Attorney General, after consultation with appropriate agencies of the Government, upon petition of the importing employer." 8 U.S.C. § 1184(c).

Pursuant to his authority under the Act, the Attorney General has promulgated a regulation which requires the petitioning employer for an H–2 "temporary worker" applicant to seek labor certification from the Secretary of Labor prior to approval of the applicant's petition. That regulation provides in pertinent part:

> Every petitioner must attach to every nonimmigrant visa petition to classify an alien under section 101(a)(15)(H)(ii) of the Act ... either:

---

**4.** Plaintiffs have shown four instances since 1977 in which foreign laborers entered the United States with B–1 visas issued under the authority of INS Operations Instruction 214.-2(b)(5). The foreign laborers performed work

on projects in Alabama, Pennsylvania, New York, and Kentucky. Plaintiffs assert that the work performed on those projects was work that plaintiffs' members were qualified and willing to perform.

(A) A certification from the Secretary of Labor ... stating that qualified persons in the United States are not available and that the employment of the beneficiary will not adversely affect wages and working conditions of workers in the United States similarly employed; or

(B) A notice that such certification cannot be made. If there is attached to the petition a notice from the Secretary of Labor ... that certification cannot be made, the petitioner shall be permitted to present countervailing evidence.... All such evidence submitted will be considered in the adjudication of the petition.

8 C.F.R. § 214.2(h)(3) (1985); *see also* 22 C.F.R. § 41.55 (1985) (Secretary of State's regulation detailing factors considered by consular officer in determining whether an alien is classifiable as a "temporary worker").

## II.

### *The Present Case*

#### A.

#### *Factual Background*

Homestake began construction in early 1984 on its McLaughlin Gold Project in order to open a new gold mine. Due to metallurgical problems in the Lake County region, Homestake concluded that it was necessary to employ technology not used previously in the gold mining industry. Davy McKee Corporation ("Davy McKee"), Homestake's construction manager, therefore conducted a search to locate the appropriate technology.

On behalf of Homestake, Davy McKee agreed to purchase a newly-designed gold ore processing system from Didier-Werke ("Didier"), a West German manufacturing company. Although the purchase agreement required Didier to supply an integrated processing system, it was not possible to premanufacture the entire system in West

Germany. The purchase agreement was therefore made contingent upon Didier's West German employees completing the work on the system at the project site in Lake County.

In September 1984, Didier submitted B–1 "temporary visitor for business" visa petitions on behalf of ten of its West German employees to United States consular officers in Bonn, West Germany. Relying upon INS Operations Instruction 214.-2(b)(5), consular officers approved the petitions and issued B–1 visas to the West Germans.[5] In January 1985, the West Germans entered the United States to work on the processing system. The work involves the installation of the interior linings of the system's autoclaves, and requires certain technical bricklaying skills.

#### B.

#### *Procedural Background*

On January 29, 1985, plaintiffs filed this lawsuit against the federal defendants pursuant to the Immigration and Nationality Act, 8 U.S.C. §§ 1101–1524; the Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; and 28 U.S.C. § 1361. Subject matter jurisdiction is premised on 28 U.S.C. §§ 1331, 1361, and 8 U.S.C. § 1329.

Plaintiffs allege that the federal defendants' practice of issuing B–1 "temporary visitor for business" visas under the authority of INS Operations Instruction 214.-2(b)(5) violates two provisions of the Act. First, plaintiffs allege that the practice violates section 101(a)(15)(B) of the Act, because the issuance of B–1 visas to aliens coming to the United States to perform skilled or unskilled labor is expressly prohibited by section 101(a)(15)(B). Second, plaintiffs allege that the practice violates section 101(a)(15)(H)(ii) of the Act, because aliens have been permitted to bypass the

---

**5.** Neither the West Germans nor their employer was required to seek labor certification from the Secretary of Labor, because the certification procedures only govern the issuance of H–2

"temporary worker" visas. *See* 8 U.S.C. § 1101(a)(15)(H)(ii); 8 C.F.R. § 214.2(h)(3) (1985).

labor certification requirements contained in the regulations under section 101(a)(15)(H)(ii).

Plaintiffs therefore ask this court to declare that INS Operations Instruction 214.-2(b)(5) violates the Act; to permanently enjoin the federal defendants from issuing B–1 visas under the authority of the Operations Instruction; and to order the federal defendants to reclassify the visa status of all B–1 "temporary visitor for business" alien nonimmigrants who are currently performing skilled or unskilled labor in the United States.

Shortly after filing their complaint, plaintiffs sought a temporary restraining order against the federal defendants. Following the denial of that request, plaintiffs applied for a preliminary injunction. On March 1, 1985, the court granted plaintiffs' application in part, and entered a preliminary injunction requiring the federal defendants to reclassify the visa status of the West Germans involved in this case pending the court's decision on the merits.[6] Thereafter, pursuant to Fed.R.Civ.P. 24, defendant-intervenor Homestake obtained permission to intervene in the suit.

The issues are now before the court on the parties' cross motions for summary judgment under Fed.R.Civ.P. 56.

### III.

#### Plaintiffs' Standing

■ Defendants contend that plaintiffs are not entitled to invoke the court's power in this case because they lack standing to sue.

■ The doctrine of standing arises from the "case or controversy" requirement in Article III of the Constitution. *Allen v. Wright*, — U.S. —, —, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). In analyzing standing issues, courts consider the "constitutional limitations on federal-court jurisdiction and prudential limitations on its ex-

ercise." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). To support a finding of standing, both the "constitutional" and "prudential" components must be satisfied. *See Fors v. Lehman*, 741 F.2d 1130, 1132 (9th Cir. 1984).

■ The constitutional component of standing consists of three interrelated requirements. At an "irreducible minimum," *Valley Forge Christian College v. Americans United For Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982), a plaintiff must allege: that he has suffered personal injury; that his injury is fairly traceable to defendant's challenged conduct; and that his injury is likely to be redressed by the relief sought. *Allen v. Wright, supra*, — U.S. at —, 104 S.Ct. at 3325 (citing *Valley Forge, supra*, 454 U.S. at 472, 102 S.Ct. at 758); *see also Railway Labor Executives Ass'n v. Dole*, 760 F.2d 1021, 1023 (9th Cir.1985).

■ The prudential component of standing "embraces several judicially self-imposed limits on the exercise of federal jurisdiction." *Allen v. Wright, supra*, — U.S. at —, 104 S.Ct. at 3324–25. Those self-imposed limits include: the prohibition on a plaintiff's asserting the legal rights of another person; the reluctance to adjudicate generalized grievances of the type that the two representative branches of government are more qualified to address; and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law upon which the plaintiff relies. *Id.* at —, 104 S.Ct. at 3325; *see also Preferred Communications, Inc. v. City of Los Angeles*, 754 F.2d 1396, 1402 n. 5 (9th Cir.1985).

The Supreme Court has observed that the application of the foregoing principles in a specific case "requires careful judicial examination of a complaint's allegations to

---

**6.** Under the terms of the court's preliminary injunction, the federal defendants were required to reclassify the visa status of the West Germans from B–1 "temporary visitor for business" status

to B–2 "temporary visitor for pleasure" status. *See* 8 U.S.C. § 1101(a)(15)(B); 22 C.F.R. § 41.-25(a), (c).

ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright, supra,* — U.S. at ——, 104 S.Ct. at 3325. Nevertheless, the Court has recognized that "[i]n many cases the standing question can be answered chiefly by comparing the allegations of the particular complaint to those made in prior standing cases." *Id.* (citing *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)).

## A.

### Constitutional Component

This court initially must determine whether plaintiffs satisfy the three requirements of the constitutional component.

■ With respect to the requirement that plaintiffs suffer personal injury, the court's inquiry must focus on whether plaintiffs' injuries are "too abstract, or otherwise not appropriate, to be considered judicially cognizable." *Allen v. Wright, supra,* — U.S. at ——, 104 S.Ct. at 3325. Thus, plaintiffs must allege that they have suffered injuries which are "distinct and palpable," *Warth v. Seldin, supra,* 422 U.S. at 501, 95 S.Ct. at 2206, rather than "conjectural" or "hypothetical," *City of Los Angeles v. Lyons, supra,* 461 U.S. at 102, 103 S.Ct. at 1665.

Plaintiffs here allege that their members have suffered two injuries resulting from the federal defendants' practice of issuing B-1 "temporary visitor for business" visas under the authority of INS Operations Instruction 214.2(b)(5). First, plaintiffs contend that the practice has deprived their members of opportunities to compete for employment without the threat of foreign competition, thereby adversely affecting the wages and working conditions of those individuals. Second, plaintiffs contend that the practice has deprived their members of the protection afforded by the labor certification procedures required for the issuance of H-2 "temporary worker" visas.

Courts in prior cases have recognized that allegations of injury resulting from lost opportunities to compete for economic benefits are sufficient for standing purposes. In *Association of Data Processing Service Orgs. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), for example, companies that sold data processing services sought to challenge a ruling by the Comptroller of the Currency which permitted national banks to provide such services to other banks and to bank customers. Noting the companies' allegation that "competition by national banks in the business of providing data processing services might entail some future loss of profits," *id.* at 152, 90 S.Ct. at 829, the Supreme Court found the requisite personal injury and held that the companies had standing. *See also Preston v. Heckler,* 734 F.2d 1359, 1365 (9th Cir.1984) (recognizing that the personal injury requirement is satisfied "when challenged agency conduct allegedly renders a person unable to fairly compete for some benefit"). Based upon this line of cases, the court finds that plaintiffs have alleged sufficient personal injury.

■ The second requirement of the constitutional component—that plaintiffs' injuries be fairly traceable to defendants' challenged conduct—focuses on the issue of causation. Although the harm to plaintiffs need not result directly from defendants' conduct, *see Warth v. Seldin, supra,* 422 U.S. at 504-05, 95 S.Ct. at 2208, the causation requirement will not be met if "the line of causation between the illegal conduct and injury [is] too attenuated," *Allen v. Wright, supra,* — U.S. at ——, 104 S.Ct. at 3325.

In challenging plaintiffs' standing here, defendants principally rely upon this causation requirement. Defendants argue that the failure of plaintiffs' members to obtain employment on the McLaughlin Gold Project did not result from the federal defendants' issuance of B-1 visas to the West Germans under the authority of the disputed Operations Instruction. Defendants argue that, instead, plaintiffs' members failed to obtain employment as a result of Homestake's initial business decision to utilize the West Germans on the project. Defendants therefore contend that plaintiffs

cannot establish the requisite causal connection between the federal defendants' conduct and the loss of employment by plaintiffs' members.

Defendants' argument, however, does not resolve the causation issue here, because the argument fails to focus on the two injuries alleged by plaintiffs: the denial of the opportunity to compete for employment without the threat of foreign competition, and the denial of the protection afforded by the H–2 visa labor certification procedures. To establish causation, plaintiffs need only show that these alleged injuries are fairly traceable to the federal defendants' practice of issuing B–1 visas to alien laborers under the authority of INS Operations Instruction 214.2(b)(5).

Absent the federal defendants' alleged practice pursuant to the Operations Instruction, alien laborers such as the West Germans here would have been required to obtain H–2 visas prior to entering the United States. Under section 101(a)(15)(H)(ii) of the Act, unless the Secretary of Labor or the Attorney General concluded that there were no qualified American workers available, and that the issuance of visas would not adversely affect the wages and working conditions of American workers, visas could not have been issued to the West Germans. Plaintiffs' members would then have been able to compete for employment on the McLaughlin Gold Project without the threat of foreign competition. Even if the Secretary of Labor or the Attorney General had made the requisite findings, plaintiffs' members still would have received the protections afforded by the H–2 labor certification procedures. The court therefore concludes that plaintiffs' alleged injuries are fairly traceable to the federal defendants' challenged conduct, and that plaintiffs have satisfied the causation requirement.

The third constitutional requirement for standing is that plaintiffs' injuries are likely to be redressed by the relief sought. The redressability inquiry focuses on whether plaintiffs' "prospect of obtaining relief from the injur[ies] as a result of a favorable ruling [is] too speculative." *Allen v. Wright, supra,* —— U.S. at ——, 104 S.Ct. at 3325. Here, plaintiffs seek a declaration that INS Operations Instruction 214.2(b)(5) violates the Act; a permanent injunction prohibiting the federal defendants from issuing B–1 vias under the authority of the Operations Instruction; and an order requiring the federal defendants to reclassify the visa status of all B–1 "temporary visitor for business" alien nonimmigrants who are currently performing skilled or unskilled labor in the United States.

If the court grants the relief which plaintiffs request, alien laborers wishing to enter the United States to perform work similar to that performed by plaintiffs' members will not be eligible for B–1 visas. Such alien laborers will then be required to seek certification under the H–2 labor certification procedures, and plaintiffs' members will receive the protections afforded by those procedures. And if the alien laborers cannot satisfy the H–2 requirements, plaintiffs' members will be able to seek the employment opportunities without foreign competition. It therefore appears that plaintiffs' alleged injuries can be redressed by a favorable ruling, and the court therefore finds that plaintiffs have met the redressability requirement for standing.

### B.

### *Prudential Component*

Although plaintiffs have satisfied the constitutional component of standing, the court must also consider the judicially self-imposed limits of the prudential component.

The first prudential limitation is the general rule prohibiting plaintiffs from asserting the legal rights of other persons. Plaintiffs here raise only their own rights and the rights of their members. Courts have previously recognized the standing of labor unions to bring lawsuits on behalf of themselves and their members to challenge governmental policies and practices. *See, e.g., Arizona Farmworkers Union v.*

*Buhl,* 747 F.2d 1269 (9th Cir.1984) (challenge to regulations governing labor certification process under the Act); *International Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795 (D.C.Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984) (challenge to regulations under Fair Labor Standards Act). In light of those cases, the court finds the first prudential limitation inapplicable in this case.

The second prudential limitation—the reluctance of courts to adjudicate generalized grievances more appropriately addressed by the two representative branches of government—focuses on whether the type of grievance is "shared in substantially equal measure by all or a large class of citizens." *Warth v. Seldin, supra,* 422 U.S. at 499, 95 S.Ct. at 2205. Plaintiffs here do not assert generalized grievances shared by a large class of citizens. Instead, plaintiffs allege that their members have been injured on certain specific occasions by the federal defendants' interpretation of the Act embodied in INS Operations Instruction 214.2(b)(5). Nor is plaintiffs' grievance one which is more appropriately addressed by the representative branches, since it is well settled that the judicial branch is the final arbiter on matters of statutory construction. *See Federal Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981).

The third prudential limitation is the requirement that plaintiffs' complaint fall within the zone of interests protected by the Act. To satisfy this limitation, plaintiffs need only assert an interest that is "arguably" within the zone protected by the Act. *See Association of Data Processing Service Orgs. v. Camp, supra,* 397 U.S. at 153, 90 S.Ct. at 830. Here, plaintiffs contend that the federal defendants' immigration practice violates sections 101(a)(15)(B) and 101(a)(15)(H)(ii) of the Act. As will be discussed in detail below, the protection of American workers from unnecessary foreign competition is a central theme underlying those sections of the Act. The court therefore believes that plaintiffs' complaint falls within the zone of interests protected by the Act.[7]

**C.**

*Other Relevant Standing Decisions*

The foregoing analysis demonstrates that plaintiffs have satisfied the requirements for standing. Additional support for that conclusion is found in certain other standing decisions which are factually similar to the present case.

The most significant decision is *International Union of Bricklayers v. Meese,* 761 F.2d 798 (D.C.Cir.1985) *("Bricklayers I ").* In *Bricklayers I,* B–1 visas were issued under the authority of INS Operations Instruction 214.2(b)(5) to a group of Italian aliens entering the United States to install a prefabricated sawmill in Pennsylvania. After the Italians had completed work on the sawmill, the plaintiffs filed suit to challenge the defendants' practice of issuing B–1 visas pursuant to the Operations Instruction. The district court dismissed the plaintiffs' complaint for lack of subject matter jurisdiction, lack of standing, and mootness.

On appeal, however, the District of Columbia Circuit held that the district court

---

**7.** The Ninth Circuit recently stated that in cases involving injunctive relief, a fourth prudential limitation—that plaintiffs adduce a "credible threat" of recurrent injury—should be considered in the standing analysis. *See LaDuke v. Nelson,* 762 F.2d 1318, 1323 (9th Cir.1985) (citing *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) ).

Plaintiffs here have demonstrated that on several occasions foreign laborers have entered the United States with B–1 visas under the authority of INS Operations Instruction 214.2(b)(5) to perform work of the type which plaintiffs' members are allegedly capable of performing. Further, after this matter was taken under submission, plaintiffs filed a declaration with the court stating that another group of West German bricklayers is planning to enter the United States this summer to work on a project in New York. The court therefore believes that plaintiffs have adduced a "credible threat" of recurrent injury.

had erred on each of those grounds. In addressing the issue of standing, the court of appeals first concluded that the three elements in the standing doctrine's constitutional component had been satisfied:

[Plaintiffs] have ... pointed to a systematic and administratively authorized pattern of governmental behavior which they allege to be illegal, and as a result of which they have probably suffered injuries in the past and are reasonably likely to suffer injury in the future.... Moreover, if [plaintiffs] are ultimately victorious, relief from the foreign competition engendered (or at least tolerated) by the challenged governmental action will not be conjectural, but immediate. That kind of competition will be stopped.

*Bricklayers I, supra,* 761 F.2d at 803 (citations omitted).

The court of appeals then found that the standing doctrine's prudential component had been satisfied. In this regard, the court focused on the "zone of interest" requirement:

Congress has ... been concerned with the impact of competition by foreigners on the American labor force since 1885, and has passed increasingly restrictive legislation on the entry of nonimmigrant alien workers. This court has held that statutes designed for the protection of the American workers create a sufficient "zone of interest" to confer upon those workers a proper ground for standing. We must conclude that [plaintiffs] fall within the "zone of interest" created by the Act before us, and that they can properly assert a violation of ... the provisions designed in part for their benefit.

*Id.* at 805 (citations omitted). The District of Columbia Circuit therefore reversed the judgment and remanded the case to the district court for further proceedings.

It should also be noted that both the Supreme Court and the Ninth Circuit have previously permitted labor unions to challenge INS policies on the ground that the particular policies adversely affected the wages and working conditions of the unions' members. *See Saxbe v. Bustos,* 419 U.S. 65, 95 S.Ct. 272, 42 L.Ed.2d 231 (1974); *Gooch v. Clark,* 433 F.2d 74 (9th Cir.1970), *cert. denied,* 402 U.S. 995, 91 S.Ct. 2170, 29 L.Ed.2d 160 (1971). Although the issue of standing was not expressly addressed in those cases, the decisions lend implicit support to the conclusion here.

■ The court therefore concludes that plaintiffs have standing to sue.[8]

### IV.

### *The Validity of the Operations Instruction Under the Act*

■ Plaintiffs contend that INS Operations Instruction 214.2(b)(5) violates the Act, because the Operations Instruction is inconsistent with specific provisions of the Act, and with the legislative intent underlying those provisions.

In testing the Operations Instruction against the Act, the court's task is to interpret the Act in light of the purposes Congress sought to achieve in enacting it. *Dickerson v. New Banner Institute, Inc.,* 460 U.S. 103, 118, 103 S.Ct. 986, 994, 74 L.Ed.2d 845 (1983). The starting point must be the language employed by Congress. *I.N.S. v. Phinpathya,* 464 U.S. 183, ——, 104 S.Ct. 584, 589, 78 L.Ed.2d 401 (1984). Absent a clearly expressed legislative intention to the contrary, the statutory language is to be regarded as conclusive.

---

8. Defendants raise two additional preliminary arguments. First, defendants argue that the court lacks subject matter jurisdiction to review the decisions of consular officials involving the issuance of visas. An identical argument, however, was rejected in *Bricklayers I* by the District of Columbia Circuit. *See Bricklayers I, supra,* 761 F.2d at 801. This court concludes that it has subject matter jurisdiction in this case for the reasons stated in *Bricklayers I.*

In addition, defendants argue that the Act does not create a private right of action in favor of plaintiffs here. In support of their argument, defendants contend that the Act does not permit plaintiffs to challenge the issuance of visas. This argument, however, is merely a variation on defendants' subject matter jurisdiction argument. Thus, the court finds that plaintiffs do have a private right of action under the Act.

**1398**

*Escondido Mutual Water Co. v. La Jolla, Rincon, San Pasqual, Pauma, and Pala Bands of Mission Indians,* 466 U.S. 765, ——, 104 S.Ct. 2105, 2110, 80 L.Ed.2d 753 (1984).

## A.

### The Language of the Act and the Operations Instruction

The court must begin its analysis by comparing the language of the Act with the language of the Operations Instruction. In particular, the court must focus on the nonimmigrant visa provisions in sections 101(a)(15)(B) and 101(a)(15)(H)(ii) of the Act.

Section 101(a)(15)(B) of the Act defines a "temporary visitor for business" nonimmigrant as:

> an alien (*other than one coming for the purpose of* study or of *performing skilled or unskilled labor* or as a representative of foreign press, radio, film, or other foreign information media coming to engage in such vocation) having a residence in a foreign country which he has no intention of abandoning and *who is visiting the United States temporarily for business....*

8 U.S.C. § 1101(a)(15)(B) (emphasis added). A "temporary visitor for business" nonimmigrant is entitled to receive a B–1 visa. *See* 8 U.S.C. § 1201(a)(2). Under section 101(a)(15)(B), however, an alien coming to the United States for the purpose of "performing skilled or unskilled labor" is expressly *excluded* from the "temporary visitor for business" class.

Section 101(a)(15)(H)(ii) of the Act defines a "temporary worker" nonimmigrant as:

> an alien having a residence in a foreign country which he has no intention of abandoning ... [and] *who is coming temporarily to the United States to perform temporary services or labor, if unemployed persons capable of per-*

forming such service or labor cannot be found in this country....

8 U.S.C. § 1101(a)(15)(H)(ii) (emphasis added). A "temporary worker" nonimmigrant is entitled to receive an H–2 visa. *See* 8 U.S.C. § 1201(a)(2).

INS Operations Instruction 214.2(b)(5) provides that an alien may be classified as a "temporary visitor for business" nonimmigrant if:

> *he/she is* to receive no salary or other remuneration from a United States source (other than an expense allowance or other reimbursement for expenses incidental to the temporary stay) ... [and is] *coming to install, service, or repair commercial or industrial equipment or machinery purchased from a company outside the U.S.* or to train U.S. workers to perform such service....

INS Operations Instruction 214.2(b)(5), *reprinted in* 4 C. Gordon & H. Rosenfield, *Immigration Law and Procedure* 23–358 to 23–359 (1985) (emphasis added).

A comparison of the language of section 101(a)(15)(B) of the Act with the language of INS Operations Instruction 214.2(b)(5) demonstrates that the Operations Instruction contravenes that section of the Act. Section 101(a)(15)(B) unequivocally excludes from the B–1 "temporary visitor for business" classification an alien who is "coming for the purpose of ... performing skilled or unskilled labor." 8 U.S.C. § 1101(a)(15)(B). That exclusion is reinforced by the federal defendants' own regulations. In this regard, the Secretary of State has promulgated a regulation defining "business" for purposes of section 101(a)(15)(B): "The term 'business' ... refers to legitimate activities of a commercial or professional character. *It does not include purely local employment or labor for hire.*" 22 C.F.R. § 41.25(b) (1985) (emphasis added).[9]

INS Operations Instruction 214.2(b)(5), however, does not contain an exclusion for

---

**9.** Further, the Secretary of State's regulation provides that "[a]n alien seeking to enter as a

nonimmigrant for *employment or labor pursuant to a contract* or other prearrangement *shall*

an alien seeking to enter the United States to perform skilled or unskilled labor. The Operations Instruction provides that an alien may be classified as a "temporary visitor for business" if the alien is "coming to install, service, or repair commercial or industrial equipment or machinery." The effect of this language is to authorize the issuance of a B–1 visa to an alien coming to this country to perform skilled or unskilled labor. In the present case, for example, the West Germans undeniably are performing labor—whether it be deemed skilled or unskilled—in connection with the installation of the gold ore processing system at the McLaughlin Gold Project.

Similarly, a comparison of the language of section 101(a)(15)(H)(ii) of the Act with the language of INS Operations Instruction 214.2(b)(5) shows that the Operations Instruction also contravenes that section of the Act. Section 101(a)(15)(H)(ii) classifies an H–2 "temporary worker" as an alien "coming ... to perform temporary services or labor, if unemployed persons capable of performing such service or labor cannot be found in this country." 8 U.S.C. § 1101(a)(15)(H)(ii). Because the Act requires the Attorney General to consult other agencies of the government concerning "temporary worker" visas, see 8 U.S.C. § 1184(c), the Attorney General has established H–2 labor certification procedures. Thus, an H–2 visa petition cannot be approved unless the alien's employer obtains either *"[a] certification from the Secretary of Labor ... stating that qualified persons in the United States are not available and that the employment* of the beneficiary *will not adversely affect wages and working conditions of workers in the United States* similarly employed ... [*or*] notice that such certification *cannot* be made."* 8 C.F.R. § 214.2(h)(3) (1985) (emphasis added).

In contrast, INS Operations Instruction 214.2(b)(5) does not require an alien to seek

labor certification prior to obtaining a nonimmigrant visa. More importantly, the Operations Instruction authorizes the issuance of a nonimmigrant visa to a person performing skilled or unskilled labor, though qualified Americans may be available to perform the work involved. The Operations Instruction therefore lacks the safeguards contained in section 101(a)(15)(H)(ii) of the Act and the regulation promulgated under that section. Again, the present case illustrates this point, because the parties have stipulated that neither the West Germans nor their employer was required to seek labor certification from the Secretary of Labor prior to the issuance of the visas to the West Germans.

In summary, it is apparent that the language of INS Operations Instruction 214.2(b)(5) is inconsistent with the language of sections 101(a)(15)(B) and 101(a)(15)(H)(ii) of the Act. First, the Operations Instruction ignores the provision in section 101(a)(15)(B) *excluding* skilled or unskilled labor. Second, the Operations Instruction ignores the provision in section 101(a)(15)(H)(ii) concerning the availability of qualified American workers.

### B.

### *The Intent of Congress*

Having determined that INS Operations Instruction 214.2(b)(5) is expressly inconsistent with the relevant sections of the Act, the court will also examine the congressional intent underlying those sections. As noted above, however, the scope of the court's inquiry is quite limited. Absent a clearly expressed legislative intention to the contrary, the language of the Act is to be regarded as conclusive. *See Escondido Mutual Water Co., supra,* 466 U.S. at ——, 104 S.Ct. at 2110.

---

*be required to qualify ... [for H–2 'temporary worker' status ]."* 22 C.F.R. § 41.25(b) (1985) (emphasis added). It is again important to note that an alien cannot qualify for H–2 "temporary

worker" status until his employer has sought labor certification from the Secretary of Labor regarding the availability of qualified American workers. *See* 8 C.F.R. § 214.2(h)(3) (1985).

The current substantive versions of sections 101(a)(15)(B) and 101(a)(15)(H)(ii) of the Act were enacted in 1952.[10] Congress, however, demonstrated its concern for the protection of American workers as early as 1885. In the Act of Feb. 26, 1885, 23 Stat. 332, Congress enacted legislation prohibiting the entry of contract laborers. Contract laborers generally were unskilled aliens who received minimal wages in return for passage to the United States. The importation of those laborers was intended "to oversupply the demand for labor so that the domestic laborers would be forced to work at reduced wages." H.R.Rep. No. 1365, 82d Cong., 2d Sess., *reprinted in* 1952 U.S.Code Cong. & Ad.News 1653, 1662 (discussion of 1885 Act in House Report accompanying 1952 Act). In the 1885 Act, Congress therefore sought to "protect American labor from an influx of cheaper foreign competition." *Bricklayers I, supra,* 761 F.2d at 804 (citations omitted).

In the Immigration Act of 1924, Pub.L. No. 68–139, 43 Stat. 153, Congress enacted a "temporary visitor for business" nonimmigrant provision in section 3(2) that was very similar to section 101(a)(15)(B) of the current Act. Section 3(2) was construed by the Supreme Court in *Karnuth v. United States ex rel. Albro,* 279 U.S. 231, 49 S.Ct. 274, 73 L.Ed. 677 (1929). *Karnuth* involved a challenge to a regulation providing that an alien's entry into the United States to perform "labor for hire" did not constitute "business" within the meaning of the "temporary visitor for business" class in section 3(2) of the Act.[11] In the specific case before the Court, the regulation had been applied to prohibit aliens from crossing the Canadian border to perform labor in the United States. The Supreme Court upheld the regulation. In reaching that conclusion, the Court relied primarily on its interpretation of the congressional intent underlying section 3(2):

[T]he case ... is narrowed to the simple inquiry whether the word "business," as used in the statute, includes ordinary work for hire....

The various acts of Congress since 1916 evince a progressive policy of restricting immigration. The history of this legislation points clearly to the conclusion that one of its great purposes was to protect American labor against the influx of foreign labor....

In view of this definite policy, it cannot be supposed that Congress intended, by admitting aliens temporarily for business, to permit their coming to labor for hire in competition with American workmen, whose protection it was one of the main purposes of the legislation to secure.

*Id.* at 243–44, 49 S.Ct. at 278–79 (citations omitted). The Court therefore concluded that aliens temporarily visiting the United States for the purpose of performing labor for hire were not entitled to nonimmigrant visas under section 3(2).

Significant changes in the immigration laws were enacted by Congress in the Immigration and Nationality Act of 1952, Pub.L. No. 82–414, 66 Stat. 163. Congress amended section 101(a)(15)(B) of the Act—the successor to section 3(2) of the 1924 Act—to include a specific provision *excluding* an alien from the B-1 "temporary visitor for business" class who comes to the United States "for the purpose of ... performing skilled or unskilled labor." 8 U.S.C. § 1101(a)(15)(B). Further, Congress enacted section 101(a)(15)(H)(ii) of the Act, thereby establishing the H-2 "temporary worker" class. 8 U.S.C. § 1101(a)(15)(H)(ii).

10. *See* Immigration and Nationality Act of 1952, Pub.L. No. 82–414, 66 Stat. 163. Certain technical changes not relevant to this dispute were made in 1970, 1976, and 1981.

11. Although section 3(2) of the 1924 Act closely resembled section 101(a)(15)(B) of the current Act, section 3(2) did not contain a specific *exclusion* concerning skilled or unskilled labor. In the 1952 version of the Act, Congress responded to the Supreme Court's holding in *Karnuth* by adding that specific exclusion to section 101(a)(15)(B).

In taking these actions, Congress evidenced a continuing concern for the protection of American workers from unnecessary foreign competition. The House Report accompanying the 1952 Act explained that the purpose of section 101(a)(15)(H)(ii) was to:

> grant the Attorney General sufficient authority to admit *temporarily certain alien workers,* industrial, agricultural, or otherwise, *for the purpose of alleviating labor shortages as they exist or may develop* in certain areas or certain branches of American productive enterprises....

H.R.Rep. No. 1365, 82d Cong., 2d Sess., *reprinted in* 1952 U.S.Code Cong. & Ad. News 1653, 1698 (emphasis added).

Similarly, in discussing the 1952 version of the Act, the Senate Report noted:

> While the present classes of nonimmigrants would be retained, ... the subcommittee has made recommendations with respect to each class of nonimmigrants which it believes will permit more effective control of aliens permitted to enter for temporary periods. *Under the proposed legislation, the nonimmigrant classes of admissible aliens will include ... aliens seeking to enter temporarily* to furnish services of an exceptional nature or to *furnish services or labor if unemployed persons capable of performing such services or labor cannot be found in this country. Of particular significance is the extension of the nonimmigrant classification to temporary workers who seek* to furnish services involving exceptional skill or *to furnish noncompetitive services or labor.* The admission of aliens as temporary workers has created many problems

and it is believed that by ... [the proposed legislation], many of the problems will be prevented or more effectively minimized.

S.Rep. No. 1515, 81st Cong., 2d Sess. 1, 590 (1950) (emphasis added).

The foregoing legislative history demonstrates that one of Congress' central purposes in the Act was the protection of American labor.[12] The legislative history also demonstrates that sections 101(a)(15)(B) and 101(a)(15)(H)(ii) of the Act were intended to restrict the influx of aliens seeking to perform skilled or unskilled labor in the United States. Thus, to the extent that INS Operations Instruction 214.2(b)(5) permits aliens to circumvent the restrictions enacted by Congress in those sections, the Operations Instruction is inconsistent with both the language and the legislative intent of the Act.

### C.

#### *Defendants' Arguments*

Defendants contend that INS Operations Instruction 214.2(b)(5) should be upheld because it embodies a reasonable administrative interpretation of the Act.

Defendants' argument centers on the purposes Congress sought to achieve in sections 101(a)(15)(B) and 101(a)(15)(H)(ii) of the Act. Defendants contend that those sections evidence Congress' intent to foster multiple purposes. Although defendants acknowledge that one such purpose was the protection of American labor, they argue that another was the promotion of international commerce. Further, defendants assert that the language in sections 101(a)(15)(B) and 101(a)(15)(H)(ii) reveals a

---

**12.** Other courts examining the Act have also reached this conclusion. *See, e.g., Shoreham Coop. Apple Producers Ass'n v. Donovan,* 764 F.2d 135, 141 (2d Cir.1985) (Secretary of Labor "enjoys considerable discretion in ensuring that importation of H–2 workers does not adversely affect domestic workers' jobs"); *Virginia Agricultural Growers Ass'n v. U.S. Dep't of Labor,* 756 F.2d 1025, 1029 (4th Cir.1985) ("[B]oth the

[H–2] statute and INS regulations provide ... safeguards for American workers"); *Elton Orchards, Inc. v. Brennan,* 508 F.2d 493, 500 (1st Cir.1974) ("To recognize a legal right to use alien workers upon a showing of business justification would be to negate the policy which permeates the immigration statutes, that domestic workers rather than aliens be employed wherever possible").

tension between American labor interests and international commerce interests; that the Operations Instruction seeks to minimize the tension; and that the Operations Instruction is therefore consistent with the multiple purposes in the Act.

Defendants rely primarily upon the decision of the Board of Immigration Appeals in *Matter of Hira,* 11 I. & N. Dec. 824 (BIA 1966). In *Hira,* an alien employed by a Hong Kong custom-made clothing manufacturer had entered the United States under the authority of a B-1 "temporary visitor for business" visa. While in this country, the alien took orders on behalf of his employer from prospective customers, and took the measurements of those customers. Prior to the expiration of the alien's visa, the INS commenced deportation proceedings against him. The INS concluded that the alien's activities involved the performance of skilled labor, and ordered that the alien be deported for failure to maintain his B-1 "temporary visitor for business" status. On appeal, the Board of Immigration Appeals focused its analysis on the term "business" within section 101(a)(15)(B) of the Act. Adopting the Supreme Court's definition from an earlier version of the Act, the Board held that "business," for purposes of section 101(a)(15)(B) of the Act, "contemplate[s] only 'intercourse of a commercial character.'" *Id.* at 827 (quoting *Karnuth v. United States ex rel. Albro,* 279 U.S. 231, 49 S.Ct. 274, 73 L.Ed. 677 (1929)). In support of that definition, the Board alluded to prior administrative cases in which aliens were found eligible for "temporary visitor for business" status because "there was involved international trade or commerce and the employment was a necessary incident thereto." *Id.* at 830 (citations omitted). The Board also elaborated upon the underlying requirements for eligibility as a "temporary visitor for business" nonimmigrant:

The significant considerations to be stressed are that there is a clear intent on the part of the alien to continue the foreign residence and not to abandon the existing domicile; the principal place of business and the actual place of eventual accrual of profits, at least predominantly, remains in the foreign country; the business activity itself need not be temporary, and indeed may long continue; the various entries into the United States made in the course thereof must be individually or separately of a plainly temporary nature in keeping with the existence of the two preceding considerations.

*Id.* at 827 (footnote omitted).

Applying those principles the Board in *Hira* concluded that the alien's business was intercourse of a commercial character, even though he took prospective customers' measurements in connection with the business. Thus, the Board held that the alien was entitled to B-1 "temporary visitor for business" status. The Attorney General subsequently affirmed the Board's decision, and certified it as controlling. *See* 8 U.S.C. § 1103(a).

Defendants argue that *Hira* controls the result in this case, since the principles underlying INS Operations Instruction 214.-2(b)(5) and *Hira* are nearly identical. Defendants focus on the portion of *Hira* that permits the issuance of B-1 "temporary visitor for business" visas to an alien coming to the United States to engage in "intercourse of a commercial character," or coming to work as a "necessary incident" to international trade or commerce. *Hira, supra,* 11 I. & N. Dec. at 827, 830. Defendants argue that here the West Germans came to this country only as a necessary incident to the purchase and sale of the gold-ore processing system, rather than as individuals hired expressly as laborers. Further, defendants contend that it must be presumed that Congress has acquiesced in the policies underlying the Operations Instruction, because Congress has been aware of those policies for many years but has failed to take action.

Defendants' arguments are answered primarily by the language of the Act. It is

important to reemphasize that in matters of statutory interpretation, a court must interpret the statute in light of the purposes Congress sought to achieve in enacting it. *Dickerson v. New Banner Institute, Inc., supra,* 460 U.S. at 118, 103 S.Ct. at 994. And absent a clearly expressed legislative intention to the contrary, the statutory language is regarded as conclusive. *Escondido Mutual Water Co., supra,* 466 U.S. at ——, 104 S.Ct. at 2110. Under those principles, the language of section 101(a)(15)(B) of the Act which *excludes* an alien "coming for the purpose of ... performing skilled or unskilled labor," 8 U.S.C. § 1101(a)(15)(B), precludes defendants' purported distinction between business and labor in this case; so does the expressed congressional intent of protecting American labor.

Similarly, there is no indication that Congress has acquiesced in the policies underlying INS Operations Instruction 214.-2(b)(5). The current substantive versions of sections 101(a)(15)(B) and 101(a)(15)(H)(ii) were enacted in 1952. The Operations Instruction was not promulgated until 1972. And there is no suggestion from legislative history that Congress considered either the specific holding of the Board of Immigration Appeals in *Hira* in 1966, or *Hira*'s impact on other types of foreign labor performed in the United States.

■ The interpretation of a federal statute by the officials responsible for its administration is entitled to deference. *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 31–32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981). A court, however, must reject an administrative interpretation "that [is] inconsistent with the statutory mandate or that frustrate[s] the policy that Congress sought to implement." *Securities Industry Ass'n v. Board of Governors,* —— U.S. ——, ——, 104 S.Ct. 2979, 2983, 82 L.Ed.2d 107 (1984); *see also Tulalip Tribes of Washington v. F.E.R.C.,* 732 F.2d 1451, 1453–54 (9th Cir.1984) (noting that no def-

erence should be given to an administrative interpretation which violates "the plain language of the [statute] as well as the statutory purposes revealed by the legislative history").

The court concludes from both the language and legislative intent of the Act that the federal defendants' interpretation embodied in the Operations Instruction contravenes the Act. The court therefore decides that INS Operations Instruction 214.2(b)(5) violates sections 101(a)(15)(B) and 101(a)(15)(H)(ii) of the Act.

## V.

### Scope of Relief

Defendants contend that the court should limit the scope of relief to be granted in the event that the court determines, as it now has, that INS Operations Instruction 214.2(b)(5) violates the Act.

#### A.

### Injunctive Relief

■ The federal defendants contend that the court cannot issue the injunctive relief which plaintiffs seek, because plaintiffs have not obtained class certification pursuant to Fed.R.Civ.P. 23.

In support of their position, the federal defendants principally rely upon the Ninth Circuit's decision in *Zepeda v. United States I.N.S.,* 753 F.2d 719 (9th Cir.1983) (as amended). In *Zepeda,* seven individual plaintiffs filed a class action suit seeking declaratory, injunctive, and monetary relief for alleged statutory and fourth amendment violations during INS enforcement operations. Prior to obtaining class certification, the district court granted plaintiffs' application for a preliminary injunction, and entered an order restraining the INS from engaging in a wide range of enforcement activities. On appeal, the Ninth Circuit concluded that the district court properly entered the preliminary injunction.

The court of appeals, however, vacated and remanded the district court's decision because the scope of the injunction was too broad. The court of appeals held that, in the absence of class certification, the injunction must be limited to apply only to the seven individual plaintiffs. *Id.* at 727; *see also National Center for Immigrants Rights v. I.N.S.*, 743 F.2d 1365, 1371–72 (9th Cir.1984) (holding that in the absence of class certification, preliminary injunction restraining INS from applying a new regulation in connection with deportation proceedings could properly cover only named plaintiffs).

Despite the similarities between the present case and the Ninth Circuit decisions, those cases are distinguishable. In *Zepeda* and *National Center*, the plaintiffs expressly framed their complaints as class actions under Fed.R.Civ.P. 23. Here, however, plaintiffs bring the action as a membership suit, and this court has determined above that they have standing to do so. Both the Supreme Court and the Ninth Circuit have permitted courts to issue declaratory and injunctive relief in membership suits without the necessity of class certification. *See, e.g., Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (declaratory and injunctive relief); *Legal Aid Society v. Brennan*, 608 F.2d 1319 (9th Cir.1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980) (same).

## B.

### *Retroactive Application*

■ Defendant-intervenor Homestake does not question the court's power to issue injunctive relief, but urges that the ruling should not be applied retroactively. In support of this position, Homestake relies on the Supreme Court's decision in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). In that case, the court set forth the following three-pronged test for nonretroactivity:

First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that "[a court] must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." Finally, [a court must weigh] the inequity imposed by retroactive application, for "[w]here a decision ... could produce substantial inequitable results if applied retroactively, there is ample basis ... for avoiding the 'injustice or hardship' by a holding of nonretroactivity."

*Id.* at 106–07, 92 S.Ct. at 355 (citations omitted); *see also E.E.O.C. v. Puget Sound Log Scaling and Grading Bureau*, 752 F.2d 1389, 1391 (9th Cir.1985). Homestake contends that this court should apply its decision nonretroactively under the *Chevron* analysis.

There is authority in the Ninth Circuit suggesting that this court lacks the power to even engage in such analysis. In *Kessler v. Associates Financial Services Co.*, 573 F.2d 577 (9th Cir.1977), the district court found that defendant had violated the Truth in Lending Act, but ruled that its interpretation of the Act would be prospective only because the defendant had acted in good faith. On appeal, the Ninth Circuit reversed and held: "The district court's declaration that its interpretation ... would be prospective only is a nullity. The application of doctrines limiting the retroactivity of judicial decisions is restricted to appellate courts." *Id.* at 579.

This court, however, does not believe that *Kessler* applies to the present case. The rationale underlying *Kessler* appears to be limited to cases involving damages. The court of appeals there emphasized that because district court decisions are not

binding on other courts, nonretroactive application of damages awards would render those awards legally ineffective. *See id.* In cases involving declaratory and injunctive relief such as this one, different considerations are involved. This distinction was recognized by another district court in this circuit. In *Bartholomew v. Reed,* 477 F.Supp. 223 (D.Or.1979), *modified on other grounds sub nom. Bartholomew v. Watson,* 665 F.2d 915 (9th Cir.1982), the district court judge discussed the *Kessler* rule as follows:

> It is uncertain in my mind whether ... *Kessler* [is] intended to operate so as to deprive a court of equity of the usual broad discretion which it has in evaluating requests for injunctive relief, whether the injunction sought be either preliminary or final. It seems to me, however, ... the Ninth Circuit could not possibly have intended the *Kessler* doctrine to eliminate entirely the discretion possessed by a court of equity.... To do so would be to turn a judge into a nonjudge. It would impose a freeze upon flexibility that otherwise is a hallmark of the exercise of judicial discretion.

*Id.* at 235 (citations and footnote omitted). In light of the distinction between *Kessler* and the present case, the court believes that the application of the *Chevron* nonretroactivity test is appropriate here. Application of that test points to a nonretroactive application of this court's decision.

The first *Chevron* factor—that the decision to be applied nonretroactively must establish a new principle of law—favors nonretroactivity. The federal defendants have utilized INS Operations Instruction 214.2(b)(5) since 1972 and this decision appears to be one of first impression. Therefore, the court's decision invalidating the disputed Operations Instruction is one establishing a new principle of law.

The second *Chevron* factor—whether retroactive application will further or retard the operation of the rule in question—appears to be evenly balanced. In one sense, retroactive application seems preferable because American workers would immediately receive the protection of the court's decision. On the other hand, retroactive application would create significant administrative burdens for the federal defendants in connection with the reclassification of visas already issued under the Operations Instruction to an unknown number of aliens. Further, retroactive application could lead to business disputes between individuals and entities not parties to this litigation concerning the status of various other projects utilizing foreign laborers with B–1 visas.

The final *Chevron* factor—whether retroactive application would cause injustice or hardship—again favors nonretroactivity. When Homestake purchased the gold ore processing system from Didier, the parties agreed that Didier employees would complete installation of the system at the project site in Lake County. At that time, those parties operated under the belief that the West Germans were entitled to receive B–1 visas under the authority of INS Operations Instruction 214.2(b)(5). Further, owners of other business activities in the United States may currently be utilizing alien laborers who entered this country pursuant to B–1 visas that were valid at the time of issuance. Retroactive application of this court's decision therefore would result in hardship both to parties and nonparties.

Based upon the considerations embodied in the *Chevron* test, the court concludes that the decision in this case should be applied nonretroactively.

## VI.

### Order

Plaintiffs and defendants having filed cross motions for summary judgment pursuant to Fed.R.Civ.P. 56, and the court finding that there are no genuine issues of material fact,

IT IS THEREFORE ORDERED AS FOLLOWS:

1.  Plaintiffs' motion for summary judgment is granted, and defendants' motion for summary judgment is denied.

2.  INS Operations Instruction 214.-2(b)(5) is declared unlawful and in violation of sections 101(a)(15)(B) and 101(a)(15)(H)(ii) of the Immigration and Nationality Act, 8 U.S.C. §§ 1101(a)(15)(B), 1101(a)(15)(H)(ii).

3.  Defendants Edwin Meese III, George P. Schultz, and the Immigration and Naturalization Service, and their agents, successors and assigns, and all persons acting with or in concert with them, are permanently enjoined from issuing B–1 "temporary visitor for business" visas under the authority of INS Operations Instruction 214.2(b)(5).

4.  The preliminary injunction entered by the court on March 1, 1985 is superseded by this opinion and order.

5.  Plaintiffs are awarded their costs of suit.

6.  Within ten (10) days of the date of this opinion and order, plaintiffs are to file with the court, and serve on defendants, a proposed form of judgment encompassing the court's decisions in this opinion and order.